OPINION
{¶ 1} This appeal is taken from a final judgment of the Geauga County Court of Common Pleas, Juvenile Division. Appellant, Robby Krems ("Robby"), appeals from the juvenile court's judgment terminating the parental rights of his mother, Ruth Krems ("Ruth"), and granting permanent custody of Robby to appellee, Geauga County Job and Family Services ("GCJFS").
 {¶ 2} Robby was born in 1995, and for the first seven years of his life he lived with Ruth. Robby's biological father, Robert Pugh, Jr. ("Robert"), did not live with Robby and Ruth. Robert had minimal contact with Robby and provided little financial support to Ruth.
 {¶ 3} Prior to being placed in the temporary custody of GCJFS, Robby and Ruth resided in Middlefield Township, Geauga County, Ohio, with Robby's half-brother Kyle Smith Jr. ("Kyle"), age twenty-one, and his second cousins, Mary, born in 1987, and Lynn, born in 1989. On or about May 23, 2002, the juvenile court issued an emergency telephonic order granting GCJFS temporary custody of Robby and his second cousins. The removal of the children from Ruth's home was based upon Mary's allegation that Kyle had sexually fondled her on four separate occasions. Furthermore, Lynn alleged that Kyle was the father of her unborn child. All the children were removed from Ruth's household to protect them from further sexual abuse.
 {¶ 4} On May 24, 2002, a complaint was filed with the juvenile court claiming that Robby's second cousins were abused pursuant to R.C. 2151.031(A) and asserting that all the children were neglected and dependent children pursuant to R.C.2151.03(A)(2) and (3), and R.C. 2151.04(C). On that same day, a hearing on the complaint was held. At the conclusion of the hearing, the juvenile court did not accept Ruth's plea on the complaint and continued GCJFS' temporary custody of the three children. During GCJFS' temporary custody, Robby was placed with a foster family.
 {¶ 5} Thereafter, on June 19, 2003, Ruth entered a plea of "true" to the charges contained within the complaint. In addition, Ruth agreed that the submitted case plan for reunification should be adopted as an order of the juvenile court. Subsequently, the adopted case plan was amended and included the following objectives with respect to Ruth: (1) participate in an age appropriate parenting class to address Robby's basic needs such as hygiene and nutrition; (2) obtain and maintain stable employment to become independent and self-sufficient; (3) complete a psychiatric evaluation; (4) keep home in clean and sanitary condition at all times; and (5) prevent individuals who pose a risk of physical or emotional harm to reside and/or visit her home.
 {¶ 6} On May 23, 2003, GCJFS filed a motion to obtain permanent custody of Robby. A hearing was held on August 27, 2003, to determine whether GCJFS should be granted permanent custody. Robby was appointed legal counsel to represent him in this matter. The following facts were disclosed during the hearing. Chief David Easthon ("Chief Easthon"), of the Middlefield Police Department, testified that Robby was originally placed in the temporary custody of GCJFS as a result of his second cousins' allegations of sexual abuse by Kyle. While in the temporary custody of GCJFS, Robby told Chief Easthon and a social worker that Kyle had sexually fondled him.
 {¶ 7} Dr. Daniel E. Schweid ("Dr. Schweid"), a board certified psychiatrist, provided Ruth with psychiatric counseling sessions. During their sessions together, Ruth would consistently deny knowledge of Kyle's sexual abuse of the second cousins. When Dr. Schweid informed Ruth that Robby had also accused Kyle of sexual abuse, Ruth was devastated and angry. Although Ruth denied knowledge of Robby being sexually abused, Dr. Schweid testified that evidence of abuse was "wide open" and should have been recognized by Ruth. For example, Ruth often allowed Kyle, at age nineteen, to bathe in a tub with Robby and at times they slept in the same bed together.
 {¶ 8} Dr. Schweid diagnosed Ruth with a mild form of depression and adjustment disorder. He provided her with prescription medications and testified that such a diagnosis did not, standing alone, preclude her from parenting. Because Dr. Schweid knew only a limited amount of information pertaining to Ruth's background, he was unable to state a recommendation regarding Robby's permanent custody. However, Dr. Schweid informed the court that Ruth was easy to work with as she was open and honest with him, and seemed willing to comply with his directions.
 {¶ 9} Barbara Wiedmann ("Ms. Wiedmann") was assigned by GCJFS to provide Robby with therapy and counseling. After meeting with Robby, Ms. Wiedmann described him as a "special needs" child. Specifically, Ms. Wiedmann testified that Robby at age eight functioned mentally as a four or five year old child. Ms. Wiedmann stated that Robby's developmental delay required a structured home environment. During his therapy sessions with Ms. Wiedmann, Robby established that his home life with Ruth was disorganized. Robby explained that he often slept in a different room every night with various members of his family. He further confirmed that he did not have a designated place to eat his meals or a designated bed time. Ms. Wiedmann described Robby's home environment with Ruth as "chaotic."
 {¶ 10} On the other hand, when Robby was asked to illustrate life with his foster family, he described a stable and structured family environment. Ms. Wiedmann testified that in the short time with his structured foster family Robby had shown tremendous progress in his mental ability to verbalize his thoughts and his general attitude had greatly improved.
 {¶ 11} Dawn Bates ("Ms. Bates") was assigned by GCJFS to conduct a home study for Ruth. Initially, Ms. Bates had difficulty in conducting the home study as Ruth had moved in with her boyfriend and his mother. Ms. Bates determined that there was a possible criminal history of sexual abuse relating to the boyfriend's mother. After Ruth realized that the home study could not be conducted without receiving more information regarding the mother's criminal background, she decided to move in with her nephew, his wife, and their son.
 {¶ 12} Ms. Bates testified that Ruth's nephew's family rented a three bedroom house in Middlefield, Ohio, on a month to month basis. The nephew was unemployed and attempting to collect workers' compensation, while his wife provided the family with their sole source of income by working as an Amish taxi driver.[1] Ms. Bates described the family's house as clean and relatively safe with the exception of a deep hole in the back yard. The family informed Ms. Bates that they were amenable to Robby being placed in their home as long as he remained in Ruth's custody. Nevertheless, Ms. Bates ultimately did not recommend the family's household for placement of Robby because Ruth had demonstrated poor decision making which consistently placed her children at risk and because the family refused to accept actual custody of Robby.
 {¶ 13} Karen Jeffries ("Ms. Jeffries") acted as Robby's guardian ad litem and provided the juvenile court with a written report and testimony regarding her recommendation as to Robby's permanent placement. Ms. Jeffries written report and testimony recommended that GCJFS be granted permanent custody of Robby. First, Ms. Jeffries noted that Ruth failed to comply with the case plan's objective requiring her to obtain employment and provide Robby with a stable well structured home environment. During Robby's temporary custody with GCJFS, Ruth worked briefly in January 2003, as a part-time employee at Dairy Mart. However, Ruth's employment at Dairy Mart was terminated, and Ms. Jeffries noted that Ruth failed to actively search for further employment elsewhere.
 {¶ 14} Ms. Jeffries testified positively that Ruth had complied with the case plan in other respects, such as attending parenting classes, visiting with her psychiatrist, and attending scheduled visits with Robby. She also explained that Robby had formed a strong bond with his foster family and enjoyed participating in their family activities. Despite this strong bond, Ms. Jeffries also stated that Robby had expressed his desire to live with Ruth. Nevertheless, Ms. Jeffries believed that Ruth would be unable to provide Robby with a stable place to live based upon her inability to find employment and Robby's need for a structured home life.
 {¶ 15} Julie Dwyer ("Ms. Dwyer") was assigned by GCJFS to act as Robby's social worker. Ms. Dwyer's recommendation to the juvenile court was to grant permanent custody to GCJFS. This recommendation was based upon Ms. Dwyer's personal observation that Ruth's inability to obtain employment prohibited her from becoming independent and self-sufficient. Furthermore, although Ms. Dwyer recognized that Ruth had attended the required parenting and psychiatric sessions, she described Ruth's progress as minimal.
 {¶ 16} Robby's foster mother, Cindy Griffin ("Mrs. Griffin"), testified that when Robby was initially placed in her home he had difficulty cleaning and caring for himself and had to be taught the basics of personal hygiene. She noted that Robby's teeth were in bad shape and required extensive visits with the dentist. Mrs. Griffin stated that she and her family had bonded with Robby and they have noticed a major improvement in his development since being placed in their home.
 {¶ 17} Ruth also provided testimony during the hearing. Ruth testified that she very much wanted Robby to live with her again. However, Ruth admitted on cross-examination that, at the time of the hearing, she was still not ready to take custody of Robby.
 {¶ 18} Ruth further testified with respect to her prior employment history. Specifically, Ruth stated that in the eight years prior to GCJFS' temporary custody of Robby she had only obtained employment for a total of ninety days. She further testified that Robby had never seen a dentist because she had been unable to find one that specialized in working with children. Moreover, Ruth's testimony revealed that she did not own a vehicle and was not licensed to drive. Ruth stated that she would have to rely upon others to provide transportation.
 {¶ 19} The juvenile court also held an in-camera interview with Robby. During the interview, Robby stated that he enjoyed spending time with his foster family. However, Robby also informed the juvenile court that he would like to live with Ruth.
 {¶ 20} Following the hearing, the juvenile court issued a judgment entry granting GCJFS permanent custody of Robby. Within its judgment entry, the juvenile court determined that Robby had been abandoned by his biological father and could not be placed within a reasonable time with Ruth and should not be placed with her. The juvenile court also stated, "[t]he court further finds by clear and convincing evidence that it is in the child's best interest that permanent custody of the child be granted to GCJFS. * * * The child has interacted with his mother through regular weekly supervised visits. The child has no difficulty separating from his foster parent's [sic] to visit with his mother and has not had difficulty returning to his foster family at the end of visits with his mother. The child has expressed to the guardian ad litem and to the court that it is his preference to return to live with his mother. The court recognizes the child is 8 years old and it is not uncommon for a child of that age to desire to live with a parent, regardless of the circumstances from which the child was removed. The court finds that the child has developed strong emotional bonds between his foster parents and his foster siblings. He appears to be happy in the foster home and has made significant progress in addressing the developmental delays and dental hygiene issues that the child came into foster care with. The foster family has developed strong emotional attachments to the child and the foster parents have indicated they would seek to adopt the child if the child was made eligible for adoption as a result of these permanent custody proceedings.
 {¶ 21} "* * *
 {¶ 22} "The child has a strong need for a legally secure permanent placement that cannot be achieved without a grant of permanent custody to GCJFS. The guardian ad litem has recommended that GCJFS be granted permanent custody.
 {¶ 23} "* * *
 {¶ 24} "It is therefore the order of this court that the minor child, Robby Krems, * * * be placed in the permanent custody of GCJFS and that the parental rights and responsibilities of Ruth Krems and Robert Pugh, Jr. be terminated."
 {¶ 25} From this judgment, Robby filed a timely notice of appeal and now sets forth three assignments of error for our consideration:
 {¶ 26} "[1.] The trial court's finding that the minor child cannot be place with his mother within a reasonable period of time (and should not be placed with his mother) is not supported by clear and convincing evidence.
 {¶ 27} "[2.] The trial court erred when it failed to consider the child's wishes and found that it is in the child's best interest to grant permanent custody to the department"
 {¶ 28} "[3.] The trial court erred when it failed to inquire whether the guardian ad litem's recommendation changed after presentation of all evidence from all parties."
 {¶ 29} Under his first assignment of error, Robby argues that the juvenile court's determination that he could not be placed with his mother within a reasonable period of time and should not be placed with her is not supported by clear and convincing evidence. In support of his argument, Robby cites to evidence presented during the hearing which he concludes demonstrated that Ruth had substantially remedied the conditions that caused his removal. We disagree.
 {¶ 30} As will be discussed in more detail, the matter before us represents the precise circumstances for which the Ohio General Assembly enacted the statutory time limitations of R.C.2151.414(B). Although Ruth was not an evil or abusive mother, there was clear and convincing evidence presented establishing that Robby was victimized by her inability to care for him. The evidence shows a pattern of neglect by Ruth which resulted from her failure to have the means to support herself and Robby. As a result, she and Robby were totally dependent, at various times, on her relatives and her boyfriend, thereby creating an unstable home environment for Robby. Rather than allowing Robby to languish in the temporary custody of GCJFS for an extended amount of time, the legislature has determined that a period of twelve months of a consecutive twenty-two month period was an adequate duration of time for Ruth to resolve her parenting issues. She has failed to do so.
 {¶ 31} R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing and, provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 32} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 33} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 34} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 35} Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 36} The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C.2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In re Holcomb (1985), 18 Ohio St.3d 361, 368. An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. Inre Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at 8.
 {¶ 37} First, we note that the juvenile court properly determined that Ruth had been provided with parenting classes, counseling services, psychiatric services, and case management services. Furthermore, the juvenile court appropriately noted that Robby had interacted with his mother on a weekly basis and that he had expressed his preference to live with his mother.
 {¶ 38} Notwithstanding these factual conclusions, the juvenile court made the initial determination under R.C.2151.414(B)(1) that Robby was neither abandoned nor orphaned, but that he could not be placed with Ruth within a reasonable period of time and should not be placed with her. It further recognized that Robby had been in the temporary custody of GCJFS for more than twelve months of a consecutive twenty-two month period.
 {¶ 39} That being said, the juvenile court proceeded to determine, by clear and convincing evidence, that Ruth had not substantially complied with the case plan as she had failed to obtain employment or provide Robby with a stable home environment. In doing so, the juvenile court had a substantial amount of clear and convincing evidence to base its determination. Namely, testimony and evidence presented during the trial demonstrated that Ruth had only obtained employment for one month during the implementation of the case plan. Testimony at trial revealed that Ruth was not actively searching for employment. Moreover, both Robby's guardian ad litem and social worker expressly recommended that permanent custody be granted to GCJFS because Ruth would be unable to provide Robby with the appropriate parental care.
 {¶ 40} The juvenile court noted that Ruth's failure to obtain regular employment has perpetuated her inability to provide a stable home environment. She was currently living with her unemployed nephew and his family in a three bedroom monthly rental house. They were supported by a single income derived from his wife's Amish taxi service. The wife testified at trial that, ultimately, if there were any financial hardships she would look out for her family first. Even Ruth admitted that she was not ready to take custody of Robby.
 {¶ 41} Although Robby argues that it was improper for the juvenile court to grant permanent custody to GCJFS based solely on Ruth's inability to obtain employment, this court has previously affirmed the termination of parental rights on this basis alone. See, e.g., In re Cather, 11th Dist. Nos. 2002-P-0014, 2002-P-0015 and 2002-P-0016, 2002-Ohio-4519, at ¶ 45 (holding that the parent's failure to seek and obtain employment to help maintain stable housing established clear and convincing evidence that the parent did not substantially comply with the case plan and, therefore, the termination of parental rights was affirmed).
 {¶ 42} The ability to be employed cannot be viewed in a vacuum. Ruth's ability to obtain employment and maintain a home, structured or otherwise, was particularly important in the case at bar as Robby was a "special needs" child requiring a structured family life. Without this structured environment Robby's delayed development would continue.
 {¶ 43} The evidence at trial confirmed that even when Ruth had Robby in her care, she was unable to remedy the disorganized and unstable household that resulted in his developmental delays. Further, as previously indicated, the evidence showed that Ruth was dependent on others for her own care and support as well as that of her child. Such a dependency caused her to be unwilling or unable to appreciate how vulnerable this made her and her child to unscrupulous providers.
 {¶ 44} Ruth's own testimony demonstrates a pattern of neglect that has yet to be resolved. Specifically, Ruth has a long history of an unwillingness or inability to provide for herself and Robby. Her testimony establishes that prior to GCJFS' temporary custody of Robby she failed to actively seek employment despite her family's financial difficulties and Robby's need for a stable home environment. Even while unemployed, Ruth did not exercise the fundamental parenting skills necessary to safeguard Robby from sexual abuse, provide a structured daily routine, or properly care for such basics as Robby's personal hygiene. These problems continued throughout GCJFS' custody of Robby as it is clear that Ruth failed to obtain or adequately seek employment and has left the responsibility of providing Robby with a stable home life to others.
 {¶ 45} Again, Ruth's failure to resolve these issues is accentuated by Robby's developmental delay. While a normal child might have been better able to cope, Robby simply did not have the tools to adapt to the difficult and uncertain home life that Ruth created and failed to repair.
 {¶ 46} As noted above, there was an abundance of clear and convincing evidence provided at the hearing to support the juvenile court's determination to grant GCJFS permanent custody of Robby. Thus, there was no error by the juvenile court. Robby's first assignment of error is without merit.
 {¶ 47} Under his second assignment of error, Robby contends that the juvenile court erred in determining that it was in his best interest to grant GCJFS permanent custody without considering his expressed preference to live with his mother. We disagree.
 {¶ 48} Pursuant to R.C. 2151.414(D), the juvenile court was required to consider "the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." In the instant case, Robby expressed his preference to live with Ruth to his guardian ad litem and to the juvenile court during its in-camera interview. The court specifically considered Robby's wishes in its judgment entry stating "[t]he child has expressed to the guardian ad litem and to the court that it his preference to return to live with his mother. The court recognizes the child is 8 years old and it is not uncommon for a child of that age to desire to live with a parent, regardless of the circumstances from which the child was removed."
 {¶ 49} Clearly, the juvenile court has complied with the mandates of R.C. 2151.414(D) by considering Robby's wishes, with due regard for his level of maturity. The court based its decision to grant GCJFS permanent custody of Robby, despite his wishes, on clear and convincing evidence. Specifically, the evidence presented at trial demonstrated that Robby, at age eight, functioned mentally as a four or five year old child. The court's in-camera interview revealed that Robby does have some difficulty in verbalizing and expressing his thoughts. Based upon this evidence, the juvenile court appropriately limited the weight it placed upon Robby's statements expressing his preference to live with Ruth. Ultimately, the court decided that Ruth's inability to provide Robby with a stable and structured home environment outweighed his preference to live with Ruth.
 {¶ 50} As the juvenile court has properly considered Robby's wishes pursuant to R.C. 2151.414(D), there is no error. Appellant's second assignment of error is without merit.
 {¶ 51} Under his third assignment of error, appellant contends that the juvenile court erred when it failed to inquire whether Ms. Jeffries recommendation, as guardian ad litem, to grant GCJFS permanent custody of Robby had changed after the presentation of all the evidence from the parties. Robby submits that because Ms. Jeffries testified prior to the conclusion of both parties' cases, the court was required to elicit further testimony regarding whether her recommendation had changed based upon the additional evidence presented at the hearing. We disagree.
 {¶ 52} R.C. 2151.414(C) requires the guardian ad litem to submit a written report to the court prior to or at the time of the permanent custody hearing. Absent is a requirement that the guardian ad litem present testimony at the permanent custody hearing. In the case sub judice, Ms. Jeffries submitted a written report and provided testimony at the hearing to enable the parties to question her regarding the report.
 {¶ 53} Certainly, there is nothing that required the court to procure further testimony from Ms. Jeffries regardless of the stage of the hearing. Ms. Jeffries's report and testimony were based upon her personal observations of Robby's interactions with Ruth and his foster family and Ruth's non-compliance with the adopted case plan. Thus, the trial court did not err by failing to inquire, at the close of all evidence, whether Ms. Jeffries's recommendation had changed. Appellant's third assignment of error is without merit.
 {¶ 54} Based upon the foregoing analysis, appellant's three assignments of error are without merit. The judgment of the juvenile court, therefore, is affirmed.
Judgment affirmed.
Ford, P.J., concurs.
O'Neill, J., dissents with dissenting opinion.
[1] Testimony at trial revealed that her nephew had received workers' compensation for a limited duration, but that such compensation had been terminated.