[Cite as *In re C.K.*, 2013-Ohio-3773.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**ASHTABULA COUNTY, OHIO**

| | | |
|---|---|---|
| IN THE MATTER OF: C.K. | : | **O P I N I O N** |
| | : | |
| | : | **CASE NOS. 2013-A-0028** |
| | : | **and 2013-A-0029** |
| | : | |
| | : | |

Civil Appeal from the Ashtabula County Court of Common Pleas, Juvenile Division, Case No. 12 JC 57.

Judgment: Affirmed.

*Laura M. DiGiacomo*, Ashtabula County Children Services Board, 3914 C Court, P.O. Box 1175, Ashtabula, OH 44005-1175 (For Plaintiff-Appellee).

*Carol G. Grasgreen*, 5061 Glenn Lodge Road, Mentor, OH 44050 (For Defendant-Appellant, Michael King).

*Ariana E. Tarighati*, Law Offices of Ariana E. Tarighati, L.P.A., 34 South Chestnut Street, Suite #100, Jefferson, OH 44047-1092 (For Defendant-Appellant, Ashley Gildersleeve).

*Anita B. Staley*, Barthol & Staley, L.P.A., 7327 Center Street, Mentor, OH 44060 (Guardian ad litem).

THOMAS R. WRIGHT, J.

{¶1} Appellants appeal from the final judgment in a parental-rights proceeding before the Ashtabula County Court of Common Pleas, Juvenile Division. The trial court terminated the parental rights of appellants, Michael King and Ashley Gildersleeve, as

to their third minor child, C.K., so that she can be placed for adoption by her present foster parents. Although maintaining separate appeals, each appellant raises the same basic argument for consideration: i.e., that the trial court's underlying findings of fact were against the manifest weight of the evidence.

{¶2} King and Gildersleeve have been involved in a sustained relationship for over seven years, beginning in the mid-2000's. During the majority of their relationship, King and Gildersleeve have resided together at various locations in Ashtabula County. Whenever the couple has encountered difficulties, Gildersleeve has lived for short stints with her mother, Sherri Smith, who also resides in Ashtabula County.

{¶3} Throughout the course of the relationship, King and Gildersleeve have had three children. Furthermore, prior to their involvement, each of them had two children with separate partners. King's two prior children resided solely with their mother, and King maintained no contact with them after their birth. However, Gildersleeve's two prior children, B.B. and C.B., initially resided with her and King when they began to cohabitate.

{¶4} During the entire length of their relationship, King and Gildersleeve have experienced serious problems due to their use of illegal drugs. While the nature of their use has varied over the years, at the time of the underlying action, King was taking heroin, and Gildersleeve's "drug of choice" was opiates. In trying to conquer their addictions, they have participated in treatment programs, and have been able to maintain sobriety for periods of time. For example, King was once able to stay sober for 18 months until he was involved in an automobile accident and began to take painkillers for his injuries. As a direct consequence of his drug problem, King was unable to

2

maintain consistent employment and was incarcerated at least four times while he was involved with Gildersleeve. Although only indirectly attributable to her drug use, Gildersleeve's employment was also inconsistent, and she was once required to serve jail time based upon a criminal conviction for theft.

{¶5} As of February 2007, King was incarcerated, and Gildersleeve was living in Ashtabula County with her original two children, B.B. and C.B., and her first child with King, K.B. On two occasions over a two-month span, C.B. was found unsupervised and without proper clothing in the parking lot of Gildersleeve's housing development. While the matter was referred to the county children services board for investigation, the board did not take custody of any of the three children at that time. Instead, it was agreed that custody of B.B. would be given to his natural father, and custody of C.B. and K.B. would be given to the maternal grandmother, Sherri Smith.

{¶6} Smith's custody of K.B. lasted for four months. In August 2007, she informed the children services board that, due to her own health issues, she could only take proper care of one child, C.B. As a result, the board transferred custody of K.B. to King's mother. However, this new arrangement lasted less than a month. Therefore, in September 2007, the board instituted a custody proceeding in regard to K.B. before the juvenile court, and was immediately awarded temporary custody of that child.

{¶7} Within one month of taking custody, the children services board placed K.B. in a foster home. Even though the board formulated a reunification plan for King and Gildersleeve, they were unable to remedy the problem, i.e., the drug abuse, that led to the removal of all three children from Gildersleeve's home. Accordingly, in April 2009, the juvenile court granted permanent custody of K.B. to the board. K.B. was then

3

adopted by the foster family who had custody of her during the prior 18 months.

{¶8}    While the proceedings regarding K.B. went forward, King and Gildersleeve moved to Stark County, Ohio.  There, on October 5, 2008, the couple had their second child, S.K.  Since Gildersleeve tested positive for illegal drugs at the time of the birth, S.K. was immediately taken into custody by the county authorities.  Fifteen months later, the Stark County family court held that S.K. was an abandoned child, and that she could not be placed with either parent within a reasonable time.  Hence, the court terminated King's and Gildersleeve's parental rights over S.K.

{¶9}    At some point, King and Gildersleeve decided to move back to Ashtabula County.  On June 9, 2010, the couple had their third child, C.K.  During the first 23 months of her life, C.K. remained in King's or Gildersleeve's custody.  During this same time frame, the maternal grandmother, Sherri Smith, continued to have custody of C.B.

{¶10}  Early in 2012, Gildersleeve was incarcerated in the county jail on her theft conviction.  Consequently, King had sole custody of C.K.  On the afternoon of March 29, 2012, two officers with the Ashtabula City Police Department received a reliable tip from an undercover policeman that a suspect was seen driving a motor vehicle after he had "shot up" heroin.  Based upon the tip, the two officers spotted the vehicle parked at a local gas station.  After initiating a traffic stop, the officers identified King as the suspect who had driven the vehicle to its present location.  In response to one officer's question, King admitted that there was a "needle" inside the vehicle.  Following King's arrest, the needle was found under the driver's seat.

{¶11}  During the traffic stop, the officers noticed that C.K. was asleep in the front passenger seat of the vehicle.  The officers further noted that C.K. was not secured in

4

any seat restraints, and that she was not adequately dressed for a cool March day. As a result, one of the officers contacted the county children services board, and an intake investigator was dispatched to the scene.

{¶12} After assessing the situation, the investigator first contacted the county jail to confirm that Gildersleeve was still incarcerated. Based upon the board's records, the investigator contacted Gildersleeve's mother, Sherri Smith, who agreed to come to the gas station and take physical custody of C.K. One day after this incident, the investigator visited Smith at her residence to discuss the situation. As part of their conversation, Smith expressed her concerns about her daughter's continuing drug use and the instability of her daughter's relationship with King. In response, the investigator emphasized that, since a child could be placed with a relative without the intervention of the children services board, no new case would be instituted at that time. In light of this, the investigator informed Smith that, in order for her to obtain legal custody of C.K., it would be necessary for her to file a motion for custody with the juvenile court.

{¶13} Over the next few weeks, the investigator continued to have contact with Smith. In at least one of their conversations, the investigator reiterated the need for the submission of a motion for custody of C.K. Although Smith initially indicated that she would file such a motion, she never acted. Moreover, when King and Gildersleeve were released from incarceration, she allowed them to take back physical custody of C.K.

{¶14} In late August 2012, only five months after the "gas station" incident, King and Gildersleeve were living in an Ashtabula County residence which was the subject of a drug raid by local authorities. At the time of the raid, both King and Gildersleeve were placed under arrest, and the children services board was again immediately notified. In

5

its ensuing custody complaint, the board alleged that an active "meth lab" was found in the residence. Based upon the evidence seized in the raid, King was indicted on certain drug charges and child endangering.

{¶15} Rather than contacting Sherri Smith concerning physical custody of C.K., the children services board requested, and was granted, an ex parte emergency order of temporary custody. One day later, the board filed a complaint for permanent custody of C.K. and the termination of King's and Gildersleeve's parental rights. In addition to asserting that C.K. was a neglected child due to the parents' bad habits, the complaint also alleged that King and Gildersleeve had previously lost their parental rights as to two siblings of C.K.

{¶16} Approximately seven days after the board filed the complaint, Smith submitted a motion for custody of C.K. As the basis for the motion, Smith asserted that Gildersleeve, her daughter, had allowed C.K. to live in a dangerous environment. Smith further stated that granting custody to her would enable C.K. to live with her half-sister, C.B.

{¶17} During the pendency of the parental-rights action, C.K. was placed with the foster parents who had previously adopted King's and Gildersleeve's first child, K.B. Within 60 days of the placement, the foster parents told the board that they would be willing to adopt C.K. so that she could reside with her full-sister. During the same 60-day period, King and Glidersleeve were allowed to visit with C.K. one hour each week. Smith never requested visitation, although she saw C.K. briefly whenever she brought Gildersleeve for her visitation.

{¶18} Since the board sought permanent custody immediately, no plan to reunite

6

the child with the parents was formulated. Nevertheless, the board still imposed a plan for the purpose of modifying both King's and Gildersleeve's behavior. In attempting to comply with the plans, both took some initial steps for obtaining treatment for their drug habits. King tried to participate in a treatment program while he was incarcerated on a separate theft charge. However, prior to his incarceration, both he and Gildersleeve skipped a drug test that was mandated under the case plan.

{¶19} A two-day trial on the "permanent custody" complaint went forward before a juvenile court magistrate in November 2012. Among other evidence, the board presented the testimony of three witnesses regarding the March 2012 "gas station" incident, and the testimony of three caseworkers who were involved in the implementation of the case plan in the present action, as well as the prior custody action regarding K.B. The board also called Gildersleeve to testify on cross-examination, and submitted certified copies of the final judgments in the two prior actions in which King and Gildersleeve lost their parental rights over their first two children. In response, King testified on his own behalf. Gildersleeve and Smith did not introduce any evidence in support of their respective positions.

{¶20} Based upon the evidence presented, the court magistrate recommended that the board's complaint for permanent custody of C.K. be granted. In her final written decision, the magistrate reached three conclusions: (1) that C.K. should not be placed with either of her natural parents in the foreseeable future; (2) that the termination of the parental rights of both parents would be in the child's best interests; and (3) that there was no appropriate relative who could assume the care or custody of C.K. In support of the first conclusion, the magistrate found that both King and Gildersleeve had previously

7

lost their parental rights with respect to two sisters of C.K. As to the second conclusion, the magistrate found that C.K. had established a strong bond with her biological sister while living with the foster parents, and that the foster parents expressed an interest in adopting her.

{¶21} Even though King and Gildersleeve filed separate written objections to the magistrate's decision, they essentially raised the same argument: i.e., that the magistrate's three primary legal conclusions were not supported by the facts of the case. Upon reviewing the trial transcript, the trial court overruled the objections of both parents and adopted the entire magistrate's decision. Therefore, the court granted permanent custody of C.K. to the children services board and terminated the parental rights of King and Gildersleeve.

{¶22} Each parent filed a notice of appeal from the termination judgment. After initial review, this court consolidated the two appeals for purposes of final disposition. Nevertheless, King and Gildersleeve have submitted separate appellate briefs. In her brief, Gildersleeve raises two assignments of error for consideration:

{¶23} "[1.] The trial court erred in granting the motion for permanent custody as such decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice.

{¶24} "[2.] The trial court erred, to the detriment of appellant, by allowing appellant's compelled testimony against her constitutional right against self-incrimination."

{¶25} In his brief, King raises a single assignment of error for review:

{¶26} "The trial court erred in granting the motion for permanent custody as such

8

decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice and is contrary to the best interests of the child."

{¶27} Although set forth in separate briefs, Gildersleeve's first assignment and King's sole assignment assert virtually identical arguments concerning the merits of the court magistrate's "termination" analysis. Essentially, they argue that the board was not entitled to permanent custody of C.K. because the underlying facts of the case did not support the magistrate's three major conclusions. Since the arguments under these two assignments overlap to a significant degree, they will be addressed together.

{¶28} "'(P)arents who are suitable persons have a "paramount" right to the custody of their minor children.' *In re Murray* (1990), 52 Ohio St.3d 155, 157, * * *. 'The fundamental interest of parents is not absolute, however.' *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, at ¶11, * * *. The 'extreme disposition' of permanently terminating a parent's rights with respect to a child 'is nevertheless expressly sanctioned (* * *) when it is necessary for the "welfare" of the child.' *In re Cunningham* (1979), 59 Ohio St.2d 100, 105, * * *." *In re L.M. and A.M., Jr.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶40. Under the governing statutory scheme set forth in R.C. Chapter 2151, a juvenile court must consider two questions in determining whether the termination of a parent's rights is justified: (1) has the parent acted in such a manner as to indicate that he/she cannot be trusted to adequately protect and provide for the child; and (2) what ultimate disposition of the child would best serve his/her general welfare?

{¶29} R.C. 2151.414 delineates the procedure that a juvenile court must follow in ruling upon a request to terminate a person's parental rights to a child. Division (B)(1) of the statute sets forth the general standard for determining the merits of the issue; i.e.,

9

permanent custody of the child can be granted to the children services board if it will be in the child's best interest and one of four alternative circumstances exits. As to the "circumstance" requirement, the magistrate found that R.C. 2151.414(B)(1)(a) was applicable. That provision states that the termination of parental rights is permissible even if the "child is not abandoned or orphaned, [or] has not been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, * * * [provided] *the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.*" (Emphasis added.)

{¶30} In explaining the nature of the general standard under R.C. 2151.414(B), this court has previously indicated:

{¶31} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶32} "* * *

{¶33} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives,

10

foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶34} "The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Holcomb* (1985), 18 Ohio St.3d 361, 368, * * *. An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re Jacobs* (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at *8." *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, at ¶33-36.

{¶35} In challenging the trial court magistrate's analysis under R.C. 2151.414(B), King and Gildersleeve first maintain that the evidence did not support the conclusion that the child could not, or should not, be placed with either of them within a reasonable time. As it relates to this issue, R.C. 2151.414(E) states:

{¶36} "(E) In determining at a hearing held pursuant to division (A) of this section

11

* * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶37} "* * *

{¶38} "(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section * * *, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child."

{¶39} The magistrate's conclusion that C.K. cannot be placed with either King or Gildersleeve was based upon the finding that R.C 2151.414(E)(11) had been satisfied. The trial transcript shows that the children services board submitted into evidence certified copies of the final judgments rendered in two prior "termination" cases involving King and Gildersleeve. The judgments establish that both parents had their parental rights involuntarily terminated as to two older sisters of C.K. This evidence was readily sufficient to warrant the magistrate's finding under R.C. 2151.414(E)(11) unless King and Gildersleeve could prove by clear and convincing evidence that they were now able to adequately provide for the child's health, safety, and welfare.

{¶40} In attempting to carry this burden, King emphasizes that his trial testimony showed that he had been employed and was maintaining his own residence prior to his

12

incarceration for the separate theft offense. Similarly, Gildersleeve notes that the record established that she had previously worked as a nursing assistant for one year and that, prior to August 2012, she had lived in the same residence for 18 months. In light of this, they assert that they are both presently prepared to provide a secure permanent placement for C.K.

{¶41} However, the mere fact that King and Gildersleeve may be able to provide a home for C.K. at the present time is not sufficient to carry their burden of proof under R.C. 2151.414(E)(11). Given that King and Gildersleeve have already lost their rights in regard to two other children, the children services board demonstrated that they have not been able to provide sustained adequate care for any of their children. Moreover, the evidence showed that this inability to give proper care was due to their continuing drug addiction. If the record indicated that King and Gildersleeve had been successfully rehabilitated and able to sustain their sobriety for a considerable period, a finding that they were able to be proper parents for C.K. might be justified. But, there is no dispute that King and Gildersleeve had only taken the initial steps to be accepted into a drug treatment program. Therefore, the evidence supported the finding that, even if King and Gildersleeve were successful in overcoming their drug addictions, it would not happen within a reasonable time period.

{¶42} King further contends that the magistrate's conclusion on the "placement" issue was unwarranted because he was not given adequate time to modify his behavior and show that he was able to provide for C.K. As to this point, he emphasizes that the final hearing on the board's complaint for permanent custody was conducted only three months after the board took custody of C.K. Despite the relative shortness of this time

13

period, though, the procedure followed by the board was consistent with the governing statutory scheme. Although it is typical for a children services agency to only request temporary custody of a child in its original complaint, there are some circumstances in which that pleading can be based upon a request for permanent custody. *In re Allbery*, 4th Dist. Hocking No. 05CA12, 2005-Ohio-6529, ¶10, citing R.C. 2151.413, 2151.27(C), and 2151.353(A)(4). "In order to grant permanent custody in its initial disposition, the trial court must determine that permanent custody is in the best interest of the child pursuant to R.C. 2151.414(D), and that the child cannot be placed with either of his or her parents within a reasonable time for at least one of the reasons enumerated in R.C. 2151.414(E)." *Id.* As stated above, the decision to grant permanent custody of C.K. to the board in this case was predicated upon the foregoing standard.

{¶43} Moreover, the record clearly indicates that King's drug addiction had been ongoing since at least 2007, and that he had many opportunities to seek the necessary treatment so that he could provide proper care for his children. Given the sustained and repetitive nature of his and Gildersleeve's drug problems, the likelihood of their success in overcoming their problems was not as great as the potential harm C.K. would endure due to any delay of her permanent placement.

{¶44} Given the foregoing, the magistrate and trial court were justified in finding that C.K. either should not be placed with her natural parents, or could not be placed with either parent within a reasonable time. To this extent, the evidence readily supported a finding/conclusion against King and Gildersleeve on the first prong of the standard for terminating parental rights under R.C. 2151.414(B).

{¶45} Regarding the "best Interest" prong, King and Gildersleeve submit that the

14

court magistrate's conclusion on this point must be reversed for two reasons. First, they argue that the magistrate failed to make any meaningful findings as to the factors upon which the ultimate "best interest" conclusion must be predicated. Second, they maintain that the magistrate failed to give proper weight to the strong "bond" they had with C.K. whenever they saw her as part of the court-ordered visitation.

{¶46} As previously discussed, R.C. 2151.414(D)(1) sets forth four factors which must be considered in relation to the child's best interest. These include: (1) the child's interaction with her parents, siblings, relatives, and foster care-givers; (2) the wishes of the child; (3) the child's custodial history; and (4) the child's need for a legally secure permanent placement. In this case, the magistrate's written decision did not have any meaningful findings on the second and third factors because those factors were simply not relevant under the facts of the case. However, the magistrate did make findings as to the first and fourth factor which supported granting permanent custody to the children services board. Furthermore, the magistrate's findings on those points were supported by the evidence.

{¶47} As to the "interaction" factor, the evidence established that C.K. was living with the foster family who adopted her biological sister, K.B. The foster mother testified at trial that, during the three-months in which they have lived together, C.K. and K.B. had formed a strong relationship. Similarly, a caseworker testified that, based upon her observations, C.K. and the foster mother had already developed a significant bond, to the extent that C.K. would respond to the foster mother's questions even when she was too shy to talk to the caseworker. In addition, the evidence demonstrated that the foster family was giving serious consideration to adopting C.K. Hence, the magistrate could

15

justifiably find that if permanent custody of C.K. was awarded to the board, she would be placed in an environment in which she would be engaged in nurturing relationships.

{¶48} Concerning the fourth factor under R.C. 2151.414(D)(1), this court would again note that there was substantial evidence indicating that, in light of their addictions, neither Gildersleeve nor King would be able to provide a stable environment for C.K. in the foreseeable future. For this reason, the magistrate could justifiably find that C.K. could not be placed in a legally secure permanent placement unless Gildersleeve's and King's parental rights were terminated.

{¶49} As King and Gildersleeve aptly note, the record does show that C.K. was always happy to see them during the court-ordered visitation. This was especially true as to Gildersleeve. However, given King's and Gildersleeve's clear inability to provide a home in which the child's safety and welfare would be adequately protected, the nature of their interaction with C.K. was not entitled to significant weight.

{¶50} As a separate point, Gildersleeve states that, in making the best interest determination, the magistrate improperly held against her the fact that King was arrested during the "gas station" incident. But, the analysis in the magistrate's decision does not support Gildersleeve's assertion. Furthermore, the record contains separate evidence establishing that Gildersleeve was still taking illegal drugs even after temporary custody of C.K. was given to the board. Specifically, she admitted to a caseworker that she and King did not take court-ordered drug tests because they knew the results of those tests would have been positive.

{¶51} Finally, in addition to the four factors cited above, R.C. 2151.414(D)(1)(e) provides that, in deciding the child's best interest, a juvenile court can also consider the

16

factors delineated in R.C. 2151.414(E)(7)-(11). Therefore, as part of the "best interest" analysis in this case, the magistrate and trial court could also consider the fact that both King and Gildersleeve had earlier lost their parental rights to two siblings of C.K. This fact would clearly be entitled to significant weight in determining the best interest of the child.

{¶52} Taken as a whole, the magistrate's decision contained sufficient findings to support her ultimate conclusion that the best interest of C.K. would be better served if permanent custody was awarded to the board. Moreover, the findings in question were supported by clear and convincing evidence. Thus, the magistrate and trial court were correct in holding that the children services board sustained their burden of proof as to both prongs of the statutory standard for terminating parental rights.

{¶53} As a separate challenge to the magistrate's decision to award custody to the board, King and Gildersleeve argue that there was no legitimate reason to overrule Sherri Smith's motion for custody of C.K. In support of this challenge, they first contend that the magistrate erred in finding that Smith, as the maternal grandmother, never had any significant contact with C.K. after the board took temporary custody. Second, they assert that if Smith had been given custody, C.K. would have been able to continue her relationship with her half-sister. C.B.

{¶54} In relation to their first point, the children services board did submit some evidence that supported the magistrate's finding as to the extent of Smith's contact with C.K. Specifically, a caseworker testified that, although Smith would drive Gildersleeve to the site for the weekly visitation, she would never stay for the sessions. Furthermore, there is nothing in the record to indicate that Smith ever requested separate visitation

17

with the child.

{¶55} As to the fact that Smith had custody of the half-sister, and that C.K. would have been able to live with C.B. if Smith's motion was granted, there is no dispute that this point was entitled to some weight in determining the child's best interest. However, this point was readily outweighed by the fact that, following the "gas station" incident, Smith did not retain custody of C.K. As noted above, the evidence demonstrated that when the intake investigator gave custody of C.K. to Smith, she informed Smith that it would be necessary for Smith to file a motion for custody with the juvenile court. Hence, it was evident that the investigator would not have allowed Smith to take C.K. unless she took steps to make the arrangement permanent. Despite this, Smith never filed the motion and returned custody of C.K. to Gildersleeve and King.

{¶56} According to the intake investigator, Smith readily admitted to her that her daughter still had a serious drug problem. Thus, by allowing Gildersleeve and King to take back custody of C.K., Smith showed that she was willing to place the interests of her daughter above the interests of the child. On this basis alone, the magistrate could justifiable find that Smith could not be trusted to properly protect the child's safety and welfare. For this reason, the record supports the magistrate's and trial court's decision to not grant custody of C.K. to Smith.

{¶57} As a separate issue under King's sole assignment and Gildersleeve's first assignment, they argue that they were denied a fair trial because the magistrate allowed the board to present inadmissible hearsay testimony regarding the nature of the tip the Ashtabula City Police Department received prior to stopping King's vehicle and arresting him at the gas station. Specifically, they maintain that the intake investigator should not

18

have been permitted to testify that, as part of the tip, the department was told that King was seen "shooting up" heroin.

**{¶58}** In making the disputed statement, the intake investigator was attempting to convey the substance of an assertion made by another individual, i.e., the undercover policeman. Furthermore, to the extent that the testimony may have been considered to show that King was still using illegal drugs as of March 2012, the truth of the assertion was relevant to a disputed fact in the case. Thus, the investigator's testimony concerning King's use of heroin on the date in question constituted hearsay under Evid.R. 801(C).

**{¶59}** Nevertheless, the fact that King "shot up" heroin prior to driving his vehicle to the gas station was established through other admissible evidence. Specifically, one of the arresting officers testified that he had the opportunity to question King during the course of the incident, and that King admitted to the officer that he had been "shooting heroin" at a friend's house immediately prior to his contact with the police at the gas station. Because King's statement was an admission against his own interest, it did not constitute hearsay and was otherwise admissible into evidence. *See* Evid.R. 801(D)(2). Therefore, even if the magistrate erred in overruling King's objection to the investigator's disputed testimony, the error was not prejudicial to him or Gildersleeve. For this reason, they were not denied a fair trial.

**{¶60}** Consistent with the foregoing, this court concludes that the record contains some competent, credible evidence supporting the magistrate's holding that both prongs of the R.C. 2151.414(B) standard for granting permanent custody of a child to the children services board were satisfied in this instance. In other words, the board

19

carried its burden of showing by clear and convincing evidence that C.K. should not be placed with either King or Gildersleeve, and that the granting of permanent custody to the board, so that C.K. can be placed for adoption, is in her best interest. Accordingly, as the magistrate and trial court properly entered judgment in favor of the board on its complaint for permanent custody, King's sole assignment in his appeal is without merit. Similarly, Gildersleeve's first assignment lacks merit.

{¶61} Under her second assignment, Gildersleeve claims that she was denied a fair trial because her constitutional right against self-incrimination was violated. As part of its case against her, the children services board called Gildersleeve to testify on cross-examination. Although her trial counsel objected to the procedure, the magistrate overruled the objection and required Gildersleeve to testify concerning certain aspects of her prior drug use. She asserts that the testimony was impermissible because she could have implicated herself in the commission of past criminal acts.

{¶62} The Fifth Amendment right against self-incrimination can be invoked in the context of a juvenile court proceeding. *In re Billman*, 92 Ohio App.3d 279, 280 (8th Dist. 1993), citing *In re Gault*, 387 U.S. 1, 47-48 (1967). For purposes of a criminal case, the right against self incrimination gives the defendant the ability to totally refuse to testify at trial. *In re M.J.*, 11th Dist. Ashtabula No. 2011-A-0014, 2011-Ohio-2715, ¶72, quoting *In re Myers*, 3rd Dist. No. 13-06-48, 2007-Ohio-1631, ¶32-33. In a civil action, though, the right does not relieve a person of the obligation to appear for a proceeding or respond to certain questions. *In re L.M.*, 2011-Ohio-1585, at ¶53, quoting *Tedeschi v. Grover*, 39 Ohio App.3d 109, 111 (10th Dist.1988). Instead, for civil purposes, the right protects the person from having to answer specific questions that might tend to incriminate her in a

20

future criminal action.  *In re M.J.*, at ¶72.

{¶63}  Gildersleeve's trial counsel initially sought to invoke the Fifth Amendment as a total bar against requiring her to testify on cross-examination.  In light of the foregoing authority, the magistrate's decision to overrule the initial objection was correct, and Gildersleeve could be generally compelled to testify at trial.  However, she still was free to invoke his Fifth Amendment right as to individual questions.

{¶64}  During the course of Gildersleeve's testimony, her trial counsel objected to four individual questions on the grounds of the Fifth Amendment.  In each instance, as part of the objection, counsel made a statement that was intend to remind Gildersleeve of the right against self-incrimination.  In all four instances, Gildersleeve never asserted that she wished to invoke the right as to the particular question; in fact, she did not make any statements following each objection.  Rather, the magistrate overruled each question, and Gildersleeve was required to answer.

{¶65}  As a general proposition, the right against self-incrimination is viewed as a personal privilege, and the final decision to invoke it lies solely with the witness.  *State ex rel. Butterworth v. Southland Corp.*, 684 F.Supp. 292, 295, fn.4 (S.Dist.Fla.1988), quoting *U.S. v. Mayes*, 512 F.2d 637, 649 (6th Cir.1975).  Therefore, an attorney usually cannot invoke the right on behalf of her client.  *State v. Jennings*, 126 N.J. Super. 70, 312 A.3d 864, 867 (N.J.App.1972).  Nevertheless, a trial judge does have the discretion to allow an attorney to assert the right for the benefit of her client.  *Butterworth*, at fn. 4. This is especially so when the questioning party does not object to the lack of a specific invocation by the witness, and all the individuals present at the hearing would understand that the Fifth Amendment right has been invoked.  *Bigby v. U.S. INS.*, 21

21

F.3d 1059, 1063 (11th Cir.1994).

{¶66} In this case, Gildersleeve was never expressly asked whether she wanted to invoke her Fifth Amendment right to any of the four questions. Instead, as soon as Gildersleeve's trial counsel completed her objection and accompanying reference to the Fifth Amendment, the magistrate overruled the objection. Considering the context of the objection, trial counsel properly invoked Gildersleeve's right against self-incrimination. Furthermore, the attorney for the children services board did not object to this procedure. Accordingly, Gildersleeve's right against self-incrimination was properly invoked in regard to the four disputed questions.

{¶67} The disputed questions pertained to the following four topics: (1) how long did Gildersleeve stay sober after completing a drug treatment program during the pendency of the Stark County parental-rights case; (2) what was the drug that Gildersleeve typically used; (3) when was the last time she used drugs prior to the trial on the board's complaint; and (4) why did she fail to take a court-ordered drug test while the underlying case was pending? Given that each question inquired about the nature of Gildersleeve's illegal drug use, her answers could have incriminated her in the commission of criminal acts. Thus, she should not have been required to respond to any of these questions.

{¶68} Notwithstanding the foregoing analysis, a review of the entire record also establishes that the fact that Gildersleeve was wrongfully compelled to answer the four questions did not adversely affect the outcome. Specifically, her responses were not dispositive of any of the controlling factual issues in the case. In relation to the question concerning the length of Gildersleeve's sobriety, her response, i.e., 18 months, was not

directly relevant to the issue of the nature and extent of her prior drug use. Moreover, although the magistrate cited to her response as part of the statement of facts in her written decision, there is nothing to indicate that the magistrate relied on this point in making any of her ultimate conclusions.

{¶69} As to the remaining three questions, the record shows that Gildersleeve's responses were essentially duplicative of the testimony of a caseworker who spoke to Gildersleeve approximately 11 days before the first day of the trial. The caseworker testified that, as part of the interview, she asked Gildersleeve why she had not taken the court-ordered drug test. According to the caseworker, Gildersleeve responded that she did not take the test because she knew the results would be positive for illegal drugs. The caseworker also quoted Gildersleeve as indicating that she was continuing to take opiates. This testimony was consistent with Gildersleeve's responses to the questions concerning her drug of choice and the reason why she had not taken the required drug test.

{¶70} In regard to when exactly Gildersleeve had last taken drugs, she testified that she had specifically used drugs on November 2, 2012, one week prior to the first day of the trial. In conveying Gildersleeve's prior admissions during the interview, the caseworker was not able to testify as to this particular point. Nevertheless, the crux of the caseworker's testimony was that Gildersleeve had admitted to continuing drug use during the pendency of the underlying case. In light of this admission, the exact date of her last usage was not a dispositive fact.

{¶71} Violations of a person's constitutional right against self-incrimination can be deemed "harmless" under the specific facts of a case. *U.S. v. Graham-Wright*, 715

23

F.3d 598, 604 (6th Cir.2013). Given that Gildersleeve's responses to the four disputed questions were either duplicative in nature or irrelevant to the controlling factual issues, the magistrate's violations of her Fifth Amendment right were harmless and did not deny her a fair trial. For this reason, Gildersleeve's second assignment is not well-taken.

{¶72} Pursuant to the foregoing discussion, the sole assignment in appellant King's appeal is without merit. Similarly, both assignments in appellant Gildersleeve's appeal lack merit. Accordingly, it is the judgment and order of this court that the final judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, is affirmed as to both appellants.


CYNTHIA WESTCOTT RICE, J., concurs,

DIANE V. GRENDELL, J., concurs in judgment only.