[Cite as *In re C.C.*, 2016-Ohio-7447.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF:  C.C., J.H., AND M.H., DEPENDENT CHILDREN. | : | **O P I N I O N** |
| | : | |
| | : | **CASE NOS.  2016-T-0050 and 2016-T-0058** |
| | : | |
| | : | |

Appeals from the Trumbull County Court of Common Pleas, Juvenile Division, Case No. 2007 JC 00246.

Judgment: Affirmed.

*Tammy Richardson,* Trumbull County Children Services Board, 2282 Reeves Road, N.E., Warren, OH  44483-4354 (For Appellee – Trumbull County Children Services Board).

*Judith M. Kowalski,* 333 Babbitt Road, #323, Euclid, OH  44123 (For Appellant – J.H.).

*Kimberly Anne Valenti,* P.O. Box 1149, Hudson, OH  44236 (For Appellant – Rachel Wargo.)

*Kristie M. Weibling,* Kristie M. Weibling, L.L.C., 3685 Stutz Dr., Suite 100, Canfield, OH 44406 (Guardian ad litem).

CYNTHIA WESTCOTT RICE, P.J.

{¶1}  In these consolidated appeals, appellants, Rachel Wargo ("mother") and J.H., age ten, appeal the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, terminating mother's parental rights over J.H.; his step-sister, C.C., age 13; and his sister, M.H., age eight, and granting appellee, Trumbull County Children

Services Board ("the agency") permanent custody. The principal issue is whether the trial court's judgment was supported by sufficient, credible evidence. For the reasons that follow, we affirm.

{¶2} **I. PROCEDURAL HISTORY**

{¶3} This case has a long and sad history. On August 13, 2007, the agency filed a complaint alleging that Me.C. (J.H.'s oldest step-sister), then age eight; and Mi.C. (J.H.'s step-brother), then age six (neither being involved in these appeals); and C.C., then age four; and appellant, J.H., then age two, were dependent and requesting temporary custody. The complaint alleged that Rachel Wargo was the children's mother; that her boyfriend, Michael Hanick ("Hanick"), was J.H.'s father; and that they lived in a trailer in Vienna, Ohio. The complaint further alleged that Earl Carroll was the father of Me.C., Mi.C. and C.C. The complaint alleged that on August 9, 2007, police were called to the trailer. Mother said that Hanick had been drinking and had struck Mi.C. and C.C. Police arrested Hanick for domestic violence and removed him from the trailer. The complaint alleged that on August 10, 2007, while in the Girard Municipal Court, mother and Hanick made statements demonstrating they were unable to protect the children from further harm.

{¶4} The court issued an emergency ex parte temporary custody order in favor of the agency for the purpose of foster care placement pending a determination of the dependency complaint. An adjudicatory hearing was held in September 2007. Me.C. said that Hanick had sexually abused her. However, due to the lack of physical evidence, the only finding was that the four children (Me.C., Mi.C., C.C., and J.H.) were dependent.

2

**{¶5}** In December 2007, mother and Hanick had their second child, M.H. She was added to the case plan. In July 2009, the children (Me.C., Mi.C., C.C., and J.H.) were returned to mother and Hanick. As a condition of their return, mother was required to obtain a home with at least three bedrooms to accommodate the children. Consequently, mother left the trailer and moved into rental housing in McDonald, Ohio with Hanick, and legal custody was restored to them. Hanick underwent services to address Me.C.'s allegations and was released with no issues noted.

**{¶6}** In April 2014, Me.C., then age 14, told a guidance counselor at school that Hanick was sexually molesting her again. Ex parte custody of Me.C. was granted to the agency. On April 7, 2014, the agency filed a complaint alleging that Me.C., Mi.C., C.C., J.H. and M.H. were dependent children and that Me.C. was also an abused child. Me.C. was removed from the home via an ex parte temporary custody order.

**{¶7}** On April 30, 2014, Me.C. was found to be abused and remained in the agency's custody. The other four children (Mi.C., C.C., J.H., and M.H.) were found to be dependent and allowed to remain with mother under a protective supervision order. *Pursuant to the protective supervision order, dated April 30, 2014, Hanick was ordered not to return to mother's home.* The protective supervision order also ordered the custodian of the children, i.e., mother, to follow that order. Thus, mother was ordered to keep Hanick out of the house. However, mother failed to comply with this order and allowed Hanick to remain.

**{¶8}** In late May 2014, Me.C. was placed with her paternal grandfather. During a visit at their grandfather's home, C.C. told Me.C. that Hanick had touched her private parts on several occasions. Me.C. reported this to her caseworker, Megan Martin. C.C.

3

told Ms. Martin that Hanick put his fingers in her private part. Another referral was made based on C.C.'s report. On May 27, 2014, the agency filed a motion requesting an emergency ex parte order removing Mi.C., C.C., J.H., and M.H. from mother and placing them in the agency's temporary custody. Court filings alleged that, according to the police, the McDonald rental was in deplorable condition with so much clutter police could not get through the front door. In addition, M.H., then age six, was "filthy dirty." The order was granted and the children were placed in foster care.

{¶9} On July 12, 2014, at the disposition hearing, C.C.'s report of sexual abuse was substantiated and the home was noted to be filthy. C.C., J.H., and M.H. were ordered to remain in the agency's temporary custody, and Me.C. and Mi.C. were ordered to remain in the temporary custody of their paternal grandfather.

{¶10} Meanwhile, Hanick was indicted on two counts of rape committed against Me.C. and two counts of rape committed against C.C. He pled guilty to all counts. Twelve-year old C.C. told the Judge that Hanick ruined her life. Hanick apologized to both girls in open court for raping them. He was sentenced to serve a term in prison of ten years to life concurrently for each count, with ten years being mandatory.

{¶11} On March 13, 2015, the agency filed a motion for permanent custody of C.C., J.H. and M.H. The two fathers of these three children did not participate in the permanent custody hearing. C.C.'s father, Earl Carroll, voluntarily surrendered parental rights over Me.C., Mi.C., and C.C. to the agency.

{¶12} **II. THE TRIAL TESTIMONY**

{¶13} The case was heard by the court's magistrate over two days, on October 20, 2015, and December 9, 2015. Megan Martin, the children's first caseworker,

4

testified that in 2007, Me.C., age eight, told her and mother that Hanick was sexually abusing her. Five years after the children, including Me.C., were returned to mother, in April 2014, Me.C. told Ms. Martin that Hanick was abusing her again. She told Ms. Martin that Hanick had sexual intercourse with her many times. Mother told Ms. Martin she did not believe Me.C.'s allegations. After the other four children were returned to mother, in late May 2014, C.C. told Ms. Martin that Hanick was molesting her. Mother told Ms. Martin that Me.C. and C.C. were lying about being raped because there was no physical evidence. However, Ms. Martin told mother that Hanick's saliva was found in C.C.'s underwear. Despite this DNA evidence, mother still did not believe C.C.

{¶14} Ms. Martin said that mother's refusal to believe Me.C. and C.C., even after Hanick pled guilty, shows mother is unable to protect the children.

{¶15} Jessica Watkins, the children's present case worker, testified that in 2008, a case plan was developed to address the family's needs. Mother and Hanick were given case plan goals, but this was before he was arrested. Earl Carroll, the Carroll children's father, did not participate in the case plan and so he had no goals.

{¶16} Mother's case plan goals were: (1) to maintain independent and stable housing, (2) to earn a stable income to support her family, (3) to obtain a mental health assessment and follow any recommendations of her mental health care providers, and (4) to take parenting classes. Ms. Watson said that mother attended parenting classes and thus completed that goal, but *failed to complete any of her other case plan goals.*

{¶17} As for housing, Ms. Watkins said she was concerned about mother's ability to maintain housing due to her financial instability. She was evicted from her rental in McDonald three months before trial in July 2015, due to non-payment of rent,

5

which was past due in the amount of $7,000.  Ms. Watkins was also concerned because mother did not keep that house clean.  The rental house was dirty and very cluttered and dog feces was observed on the floor.  Due to mother's lack of income, she moved back into the trailer with her ex-husband, Earl Carroll.

{¶18}  Ms. Watkins said she has been inside the trailer where mother currently resides with Earl.  She said it is small and cluttered.  It has two bedrooms.  Earl sleeps in one bedroom; he keeps his belongings in the second bedroom; and mother sleeps on a couch in the living room.  Ms. Watkins said there is insufficient space for the children to live in the trailer if they were to be reunited with mother.  There are no beds, dressers, blankets, or sheets that the children could use.  She said that, even if Earl was no longer living in the trailer, there would not be enough room for mother and the children.  Ms. Watkins said they would need at least three bedrooms.  Ms. Watkins said *mother has thus not met her goal of maintaining independent housing.*

{¶19}  As for mother's goal of earning a stable income to support her family, Ms. Watkins said mother was not working and she never even tried to get a job.  Mother previously received social security disability for Mi.C. and child support from Earl Carroll for his three children.  However, since the children were removed in late May 2014, mother has had no income.  She relies on others to buy her food and pay her bills.  Thus, *mother has not completed her goal of earning a stable income.*

{¶20}  Ms. Watkins said that mother's mental health was a case plan goal because she does not believe Me.C. and C.C. were raped. Ms. Watkins said this limitation affects mother's parenting because it prevents her from keeping the children safe.  In light of mother's unwillingness to believe her children were raped, the agency

6

concluded mother needed counseling of her own. Pursuant to the court's April 30, 2014 protective supervision order, the court ordered mother to obtain a psychological assessment and to follow her providers' recommendations. However, *mother resisted getting a psychological assessment for almost one year* and only agreed to be evaluated shortly before her annual court hearing. Dr. Thorn completed mother's psychological evaluation on March 3, 2015. *The main concern of the evaluation was mother's daily abuse of marijuana.* While mother completed a psychological evaluation, she did *not* follow through with her doctor's recommendation for mental health counseling at PsyCare. After attending only two counseling sessions there, mother was discharged from the program due to her failure to attend her appointments. As a result, *mother did not complete her mental health case plan goal.*

{¶21} Ms. Watkins said a drug and alcohol assessment was added as a goal to mother's case plan because mother told her she smokes marijuana every day. Mother said she has friends who supply her with marijuana and smoke it with her. Ms. Watkins said she gave mother the names of counseling agencies to which she could go and information for drug and alcohol treatment and mother has medical insurance through welfare, but mother has refused to look into any kind of drug treatment or assessment. *She thus failed to meet her drug and alcohol assessment goal.*

{¶22} Ms. Watkins said that when mother moved back in with Earl, she, i.e., Ms. Watkins, was surprised because mother had told her he used to hit her and the children. After she moved in with Earl, mother told Ms. Watkins that Earl sexually harasses her. Mother said she does not feel safe with him in the trailer. Ms. Watkins referred her to nearby domestic violence shelters where she would be safe, but mother refused to go.

7

As a result, Ms. Watkins said it would not be safe for the children to live in the trailer with mother.

{¶23} Ms. Watkins said that mother did one urine screen and it was positive for marijuana. Thereafter, every month during home visits, Ms. Watkins asked mother if she was to screen her, what would be the result, and every time mother said she would test positive for marijuana. Such admissions are treated as positive test results.

{¶24} Ms. Watkins said that Hanick had similar case plan goals; however, he did not complete any of these goals because he was arrested soon after the children came into foster care.

{¶25} Ms. Watkins said mother recently told her she plans to move in with a new boyfriend in Texas named "Robert," who she met on-line, as soon as these proceedings were concluded, taking her children with her if they were returned to her. However, mother never made Robert available for an investigation to be placed on the case plan.

{¶26} Ms. Watkins said that, in general, mother's visitation at the agency went well with the children. Mother has a bond with them and they seem happy to see her. However, C.C. is not consistent with visitation because she often does not want to see mother. Me.C. refuses to attend all visits with mother. Mother visits weekly, but her visitation never progressed beyond one-hour supervised visits at the agency. Ms. Watkins said there was never a time when there was enough progress to attempt off-site visits with C.C., J.H., or M.H.

{¶27} Ms. Watkins said the agency tried to place C.C. with her paternal grandfather. However, this was not successful as he failed to appear for a scheduled off-site visit. Thus, Ms. Watkins was concerned about his ability to supervise and care

8

for C.C., who was then 12. Ms. Watkins said there are no other identified relatives for placement for the children.

{¶28} Ms. Watkins said that C.C. and M.H. are now placed together in a foster home. They are doing very well with their foster parents, Mr. and Mrs. Crawford, and they are bonded with them.

{¶29} J.H. was placed in a separate foster home in July 2015, and was with that family for three months as of the date of trial. J.H. has adjusted very well to his foster parents, Mr. and Mrs. Jaros, and he is very bonded to them.

{¶30} Ms. Watkins said that both sets of foster parents are willing to adopt the children currently in their homes. The agency would like to place the siblings together, if possible, but they will do what is best to get permanency for the children.

{¶31} C.C., J.H., and M.H. are still receiving counseling services. Their respective foster parents make sure their services are being maintained. Ms. Watkins said she is especially concerned that if the children were to return to mother, she would not follow through with their mental health treatment because she did not follow through with her own mental health treatment.

{¶32} With respect to the children's wishes regarding placement, Ms. Watkins said that J.H., then age nine, said he would like to go back with mother, but if he cannot, he would like to stay with his foster parents, the Jaroses.

{¶33} M.H., then age seven, said she would prefer to stay with the Crawfords even if living with mother was an option.

{¶34} C.C., then age 12, said her preference would be to live with her paternal grandfather.

9

{¶35} Ms. Watkins said that, based on her observation during visits, C.C., J.H. and M.H. are most closely bonded to their respective foster parents. The children enjoy seeing mother because they worry about her and want to make sure she is all right, but the children are "much more relaxed" in their foster homes. They know that they are safe there and that their needs are being met. The children are also bonded to each other and enjoy seeing their sibings.

{¶36} Ms. Watkins said that mother does not show any insight into the agency's concerns. When the children were removed in May 2014, mother blamed the agency. Mother has said that Me.C. never told her she was sexually abused. However, Ms. Martin testified that in 2007, Me.C. told mother that Hanick sexually abused her. Further, Ms. Watkins testified that in or before April 2014, Me.C. told mother that she was being sexually abused by Hanick. *Mother still does not believe that Hanick raped the girls. Mother does not agree with her case plan goals. She has not shown any significant change in her behavior or progress in achieving reunification with the children.* Mother is not able to safely and adequately care for the children. Ms. Watkins said that, because mother does not feel safe in the trailer with Earl, she, i.e., Ms. Watkins, is concerned the children would not be safe there if they were reunited with mother.

{¶37} Ms. Watkins said the agency has concerns about mother's ability to protect the children because she allowed Hanick to remain in the house even after she was aware of Me.C.'s allegations in 2007 that he molested her. Despite Me.C.'s allegations, mother allowed him to remain in the home after 2009, when the children, including Me.C., were returned to her. As a result, Hanick resumed raping Me.C.

Incredibly, after Me.C. was removed from the home the second time in April 2014, mother still allowed Hanick to remain in the home, contrary to the court's April 30, 2014 protective supervision order, which resulted in Hanick repeatedly raping C.C. In addition, in July 2015, after Hanick was incarcerated, mother resumed her violent relationship with Earl Carroll. Mother wants the children to move into the trailer with her and Earl, knowing Earl had previously assaulted the children.

{¶38} Based on the foregoing, Ms. Watkins asked the court to terminate the parental rights of mother and Hanick, and to grant permanent custody to the agency with the aim that they be adopted. She said this is in the children's best interests.

{¶39} Mother testified (as on cross-examination) that since July 2015, i.e., for three months, she has been living in her trailer with Earl because she was evicted from her rental in McDonald due to non-payment of rent. She has no money to pay the $7,000 she owes in back rent. She has no verifiable income, but claimed she sometimes works doing "scrapping," i.e., she collects and sells scraps from people's garbage cans.

{¶40} Mother said she has applied for social security disability because she is an insomniac, has manic depression, anxiety, and Asperger's Disease. However, she did not provide the name of any doctor who ever made any such diagnosis or any documentation in support. She does not expect a hearing on her social security claim for about a year and it is uncertain whether it will be approved. Mother said she smokes marijuana every day and *there is no reason she would ever want to stop.*

{¶41} Mother said that she and Earl lived in the trailer in Vienna with their three children while they were married from 1999 to 2004. She said that in 2004, she

11

obtained a restraining order against Earl due to domestic violence, which required him to leave the trailer. She said that she, Me.C., Mi.C., and C.C. lived in the trailer until December 2004. Mother divorced Earl in 2004. Hanick moved into the trailer with her in 2005, and she had two children with him, J.H. and M.H. In 2009, mother and Hanick moved to the McDonald rental and Earl moved back into the trailer.

**{¶42}** Mother said that after Hanick was arrested and she was evicted from the McDonald residence in July 2015, she moved back into the trailer with Earl. She said she put her furniture, including the children's rollaway beds, in storage, but she did not pay the storage fee so she probably lost everything.

**{¶43}** Mother said that Earl has been violent with her and she would like to "kick him out," but she does not know how to do it. She said he has assaulted her on numerous occasions. She said that since she moved in with him, he constantly tries to have sex with her. She said that, although she does not feel safe around Earl, she still wants her children to come live with them in the trailer. She said she expects Earl will continue to hit her, and she thinks that J.H., who was then nine years old, would defend her. She said that while she would like to get rid of Earl, if she did, she does not know how she would get by. She needs him to pay the $250/month lot rent for the trailer and her other bills.

**{¶44}** At this point in mother's October 20, 2015 testimony, the hearing was continued for two months to December 9, 2015, at which time mother's circumstances had changed. Mother testified that in December 2015, Ms. Watkins came to the trailer for a visit. At that time, Earl was no longer living there and mother had two unrelated adults living with her in the trailer, a girlfriend named Kaleigh and Kaleigh's boyfriend,

12

D.J. They pay all of mother's bills. Mother said she has known D.J. for one month since Kaleigh started dating him. Mother said she does not know D.J.'s last name or if he has a criminal history because she is not "nosey."

{¶45} Mother admitted that when Ms. Watkins visited her in December 2015, she, i.e., mother, had "hickeys" all over her neck. She said the hickeys were from a man she started seeing the previous week, but it did not work out. She said his name is "Nick."

{¶46} Mother said that during a visit with the children in the beginning of December 2015, C.C. had an "attitude." Mother said she "got pissed off" when Ms. Watkins cut her visit short because mother was screaming at 12-year old C.C. and C.C. was upset and crying when mother told her, "I'm the one fighting for you. Your dad [Earl Carroll] gave you up."

{¶47} Mother admitted Hanick is in prison for at least ten years because he pled guilty to four counts of rape. However, when asked if she believes he raped her daughters, sadly, mother testified, "I believe in innocent until proven guilty. I have never seen anything inappropriate. * * * And if I have never seen it, what do you want me to do?" Mother said Me.C. never told her about Hanick touching her; however, as noted above, Ms. Martin and Ms. Watkins said that Me.C. told mother about the abuse in 2007 and again in or before April 2014.

{¶48} Mother said that when her children are returned to her, Kaleigh and D.J. will move to Tennessee. She said that when they leave, her income will consist of child support for the Carroll children, if Earl pays it; her son Mi.C.'s social security disability income, if he is still receiving it; and her social security disability award, if she gets one.

13

{¶49} Attorney Kristie Weibling, the children's guardian ad litem, testified that J.H. is very bonded to his foster parents, Mr. and Mrs. Jaros. He is comfortable with them and is doing well in school. He relies on them in making important decisions.

{¶50} Ms. Weibling said that M.H. and C.C. are very bonded to their foster parents, Mr. and Mrs. Crawford. They are comfortable with the Crawfords and they do very well in school. M.H., who is now eight years old, is very well behaved. C.C., who is 13, can be complicated because she has experienced tremendous trauma from being repeatedly raped by Hanick. Ms. Weibling said that the Crawfords have learned how to deal with her behaviors. When she acts out, they redirect her anger and give her space and she generally works out the problem herself.

{¶51} Ms. Weibling said that C.C. has made substantial progress with the Crawfords and if she was removed from them, she believes C.C. would regress rapidly. Ms. Weibling said that mother does not have the ability to help C.C. deal with the trauma from which she continues to suffer.

{¶52} Ms. Weibling said that M.H. is extremely bonded to the Crawfords and it would be very difficult for her to leave them. Ms. Weibling said it would be difficult for mother to help M.H., an eight-year-old, keep her daily routine.

{¶53} Ms. Weibling said the Jaroses are interested in adopting J.H. and the Crawfords are interested in adopting M.H. and C.C.

{¶54} Ms. Weibling said that Mrs. Crawford and Mrs. Jaros have agreed to continue to facilitate ongoing contact among C.C., J.H., and M.H. Thus, the children will be able to keep their sibling relationships while residing in separate homes.

{¶55} Ms. Weibling said she has monitored visits between mother and the children at the agency. During one visit, when Mi.C., C.C., J.H. and M.H. were present, mother turned her back to the video monitor and played her CD player loudly so Ms. Weibling could not see or hear what she was doing or saying. Afterward, Mrs. Crawford, who was present during the visit, said that mother was making inappropriate comments to the children, telling them not to believe what the caseworkers tell them.

{¶56} Ms. Weibling said she is concerned about mother's ability to protect the children. This is mother's second involvement with the agency. There were prior disclosures made by Me.C. to mother that Hanick was touching her. However, because mother does not believe Me.C. and C.C., mother is unable to protect the children. Ms. Weibling is also concerned due to mother's testimony that she has another man living in her home and she does not know his last name or if he has a criminal history. Ms. Weibling said that mother cannot provide for the children's needs because she has difficulty providing for her own. Ms. Weibling said mother has not followed through with her mental health treatment and admits smoking marijuana daily.

{¶57} As to the children's wishes, M.H. wants to remain with the Crawfords. Prior to her father, Earl Carroll, surrendering his parental rights, C.C. wanted to live with his father, i.e., her paternal grandfather. Now that her father has surrendered his parental rights, C.C. understands she cannot live with her grandfather so she now wants to stay with the Crawfords.

{¶58} Ms. Weibling said J.H. would prefer to stay with mother, but, in talking to him, his desire to go with her reflects his desire to be with his siblings and to return to his former school. Ms. Weibling said that if J.H. could not reside with mother, he would

15

like to stay with the Jaroses because he is comfortable and happy with them. Ms. Weibling said that, while the agency previously wanted to place all three children together, the agency now believes the children should stay in their respective foster homes.

**{¶59}** Ms. Weibling said that Me.C. has been in foster care since April 2014 (20 months), and that Mi.C., C.C., J.H. and M.H. have been in foster care since May 27, 2014 (18 months). Ms. Weibling said that each of the children needs a legally secure permanent placement and they cannot get such placement without the agency getting permanent custody. She also said it is in the children's best interests to terminate the parental rights of mother, Hanick, and Earl.

**{¶60}** Ms. Weibling said she recommends that mother's, Hanick's, and Earl's paternal rights be terminated and that permanent custody be granted to the agency for purposes of adoption. Ms. Weibling said mother has not yet substantially complied with her case plan goals. Ms. Weibling said that, even if the agency's specific concerns about mother, e.g., her inability to maintain housing, her lack of income, her mental health issues, and her chronic drug abuse, were addressed, her recommendation would not change due to *mother's inability to protect the children*. In support, she referenced the history of Me.C. and C.C. being removed from mother due to Hanick repeatedly raping them; mother doing nothing to prevent it; and even telling the caseworkers that her daughters were lying. Ms. Weibling said that, although mother loves the children, she is incapable of protecting them or properly caring for them.

**{¶61}** Ms. Weibling said that, although Hanick will be incarcerated for at least ten years, *the problem that occurred at that time, i.e., mother's inability to protect the*

16

*children, has not been remedied.* Ms. Weibling said mother exposed the children to Hanick after she was on notice of Me.C.'s initial allegations in 2007. Further, mother said she wants the children to come live with her and Earl in the trailer, although she admitted he previously assaulted the children. And, even while her children have been in foster care, mother has allowed random men, e.g., Robert, Nick, and D.J., into her life knowing virtually nothing about them.

{¶62} Ms. Weibling said that, even if the children were returned to mother, she has failed to secure income to support them, in violation of her case plan. She can no longer rely on Earl or her children for income. Earl has voluntarily surrendered permanent custody to the agency, so he is no longer liable for child support for his three children. Mi.C. might have a social security disability benefit, but that is uncertain, and mother's claim for social security disability is also uncertain.

{¶63} Mother did not present any witnesses to testify on her behalf. Thus, *no one testified that it was in the children's best interests that they be reunited with her.*

{¶64} The magistrate entered a lengthy and highly-detailed decision recommending that, as to C.C., the voluntary surrender of custody by Earl be accepted and that mother's parental rights be permanently terminated, and that, as to J.H. and M.H., the parental rights of mother and Hanick be permanently terminated. The magistrate further recommended that permanent custody of C.C., J.H., and M.H. be vested in the agency for purposes of adoption. J.H. and mother, through counsel, filed objections to the magistrate's decision. Based on the court's independent review of the magistrate's decision, objections, transcript, and the record, the court found that the

17

magistrate properly determined the facts and applied the law and overruled the objections.

{¶65} J.H. appeals, asserting four assignments of error. The first three allege:

{¶66} "[1.] The Juvenile Court abused its discretion in determining that clear and convincing evidence supported its decision to award permanent custody to the Trumbull County Department of Children's Services.

{¶67} "[2.] The decision to award permanent custody was against the manifest weight of the evidence.

{¶68} "[3.] The Juvenile Court abused its discretion in finding the award of permanent custody was in the best interests of the children."

{¶69} Further, mother appeals and asserts the following as her sole assignment of error:

{¶70} "The juvenile court abused its discretion and committed reversible error to the prejudice of mother in finding that the minor children could not or should not be returned to either parent (mother) under 2151.414(E)(1) and that it was in the best interests of the minor children to award permanent custody to TCCS as its findings were not supported by clear and convincing evidence and was against the manifest weight of the evidence thus the award of permanent custody to TCCS is a termination of her parental rights in violation of mothers' constitutional fundamental liberty interests, the right to parent her children and further error to fail to sustain mothers' objections to the magistrate's decision." (Sic throughout.)

{¶71} Because the foregoing assignments of error are related, they are considered together.

18

**{¶72} III. TWO-PRONG TEST FOR ADJUDICATING MOTION FOR PERMANENT CUSTODY – R.C. 2151.414(B)(1)**

{¶73} It is well settled that a parent's right to raise a child is a basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). Thus, a parent defending a motion for termination of parental rights "'must be afforded every procedural and substantive protection the law allows.'" *Id.*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶74} R.C. 2151.414 sets forth the guidelines to be followed by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B)(1) outlines a two-prong analysis. Under the first prong, the juvenile court must determine, by clear and convincing evidence, whether one of the following circumstances applies: (a) *that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with them based on an analysis of R.C. 2151.414(E)*; (b) that the child is abandoned; (c) that the child is orphaned; or (d) that the child has been in the temporary custody of one or more public children services agencies for at least 12 months of a consecutive 22-month period.

{¶75} In determining whether the child cannot be placed with either parent within a reasonable period of time under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the eight conditions enumerated in R.C. 2151.414(E) exist with respect to each of the child's parents. *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶33-34. "'The existence of a single [R.C. 2151.414(E)] factor will support a finding that a

19

child cannot be placed with either parent within [a] reasonable period of time.'" *In re J.S.E., J.V.E*, 11th Dist. Portage Nos. 2009-P-0091 & 2009-P-0094, 2010-Ohio-2412, ¶40, quoting *In re S.M.*, 11th Dist. Geauga No. 2008-G-2858, 2009-Ohio-91, ¶23.

{¶76} R.C. 2151.414(E) provides, in pertinent part, as follows:

{¶77} (E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶78} (1) Following the placement of the child outside the child's home and notwithstanding reasonable *case planning* and diligent *efforts by the agency* to assist the parents to remedy the problems that initially caused the child to be placed outside the home, *the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed* outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider *parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services* * * * that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. (Emphasis added.)

{¶79} If the court determines that one of the four circumstances under R.C. 2151.414(B)(1) is present under the first prong of the permanent custody analysis, the court proceeds to a determination of the second prong in which it considers whether the award of permanent custody to the agency is in the best interest of the child, based on an analysis of the factors in R.C. 2151.414(D).

{¶80} In determining the child's best interest under the second prong, R.C. 2151.414(D) requires that the juvenile court consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the

20

child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

{¶81} The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1) * * * is present. *In re Krems, supra,* at ¶36.

{¶82} **IV. THE LIMITED APPELLATE STANDARD OF REVIEW OF THE TRIAL COURT'S RULING ON A MOTION FOR PERMANENT CUSTODY**

{¶83} Once the clear and convincing standard has been met to the satisfaction of the trial court, the appellate court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof. *In re Meyer,* 98 Ohio App.3d 189, 195 (3d Dist.1994). In a civil action, the evidence is legally sufficient if the plaintiff produced *some evidence on every element essential to establish its cause of action. Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981).

{¶84} Further, in cases involving the termination of parental rights, "an appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81.

{¶85} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences,

21

considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Id.* at ¶82, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).

{¶86} "Under the manifest weight standard of review, we are 'guided by a presumption' that the fact-finder's findings are correct." *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). *See also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶21. We must make "'every reasonable presumption * * * in favor of the judgment and the finding of facts.'" *Id.,* quoting *Seasons Coal Co., supra,* at 80, fn. 3. "'If the evidence is susceptible of more than one construction,'" we are "'bound to give it that interpretation which is consistent with the * * * judgment [and] most favorable to sustaining the * * * judgment.'" *Eastley, supra*, quoting *Seasons Coal Co.*, *supra*, at 80, fn. 3.

{¶87} **V. THE TRIAL COURT'S FINDINGS UNDER THE FIRST PRONG OF THE TEST– CHILDREN CANNOT BE PLACED WITH ANY OF THE PARENTS WITHIN A REASONABLE TIME – R.C. 2151.414(B)(1)(a)**

{¶88} Under the first prong of the permanent custody analysis, the court found that the children were not in the agency's custody for 12 out of 22 months and that the children were not abandoned or orphaned. However, *the trial court found the children cannot be placed with any parent within a reasonable time and should not be placed with them pursuant to R.C. 2151.414(E).* As to Hanick, J.H. and M.H.'s biological father, the court found that he is in prison for raping his two step-daughters and is

22

expected to be there for more than 18 months after the permanent custody hearing. Thus, R.C 2151.414(E)(12) applies. Further, since Hanick pled guilty to rape; the victim (C.C.) was J.H. and M.H.'s sibling; and the victim lived in the same household as J.H. and M.H., R.C. 2151.414(E)(7)(D) applies.

{¶89} Mother argues the trial court erred because it did not make a finding that the R.C. 2151.414(E)(1) factor (parent failed to remedy the conditions causing the child's removal) applied to her. However, while the court did not specifically refer to R.C. 2151.414(E)(1), the trial court made findings of fact regarding the elements of this factor and thus essentially found R.C. 2151.414(E)(1) applied to her. The court found that mother is unable to protect the children because she "does not anticipate dangers to them" and "is not protective of her children from those who will prey on them." The undisputed evidence established that this inability to protect the children was the condition, as to mother, that caused the children to be removed from the home. The court found this condition still exists and thus has not been remedied. Further, the court found that the agency gave mother case plan goals to remedy this condition and made repeated efforts to help her remedy that condition, but that, other than attending parenting classes, she failed to meet every one of her goals, as discussed below. Further, the court found that the agency offered mother services, such as drug/alcohol, mental health, transportation, financial assistance, and shelter from abusive relationships, but mother failed or refused to use those services, as discussed below. Whether mother used the various services provided by the agency is pertinent to whether mother continuously and repeatedly failed to substantially remedy the condition that caused the children's placement outside the home. *In re A.L.a*, 11th Dist. Lake

23

Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶94. The findings of the court that follow support a finding that R.C. 2151.414(E)(1) applied as to mother.

{¶90} With respect to mother's first and second goals, the court found she failed to establish independent income to support her and her family and to maintain housing. Since the children were removed from mother in May 2014, she has had no regular income. She allows third parties, like her ex-husband and itinerant friends, to stay with her in her trailer and to support her.

{¶91} Due to mother's virtual lack of income, she does not have adequate housing. In July 2015, she was evicted from her McDonald rental due to non-payment of rent. In that same month, mother returned to the trailer to live with her ex-husband, Earl Carroll, because she had no money. Mother claimed Earl regularly subjected her to domestic violence and unwanted sexual advances, but she refused the services of a homeless shelter offered by the agency. Further, the court found the trailer is inadequate and unsuitable to accommodate the children because it is cluttered and there are only two bedrooms, one of which is unusable as it is filled with Earl's "junk." Mother put her furniture, including the children's beds, in storage, but, because she did not pay the storage fee, she presumes she has lost everything. After mother threw Earl out, she has temporarily allowed a girlfriend and the girlfriend's boyfriend to live with her in the trailer and they pay her bills.

{¶92} With respect to mother's third goal regarding her mental health, the court found that she failed to follow through with this goal. After refusing to obtain a mental health assessment for nearly a year, just before the annual court hearing, mother finally obtained one. "[T]he timing of a defendant's efforts to comply with a case plan is

24

relevant to the issue of compliance." *In re A.L.a, supra,* at ¶95. As part of mother's assessment, her doctor recommended she attend mental health counseling sessions at PsyCare, but, although she has a welfare medical card to pay for the services, she was discharged for failing to attend her appointments.

{¶93} Further, the court found there was a risk that mother's cognitive abilities do not associate certain situations as presenting a risk to the children. Despite Me.C. and C.C.'s reports of abuse and Hanick's admission of guilt, mother still does not believe her daughters were sexually abused. The court found that, although Me.C. reported the abuse in 2007, mother did not protect her when she was ordered to return home in 2009. Even after Me.C. was finally removed from the home in April 2014 due to new molestation allegations, mother did nothing to protect C.C., and she was subsequently molested. Thus, mother has had two children abused while in her care, despite prior warnings of impending abuse. The court found that mother does not understand the need to protect the children from danger such as "what they experienced from Mr. Hanick." The court noted that, when asked if she checked the background of people who would be around her and/or her children, she said she does not pre-judge people. Mother's failure to accept mental health counseling services, although covered by welfare, shows she repeatedly failed to substantially remedy the conditions that caused the children to be removed. *In re A.L.a, supra*, at ¶94.

{¶94} As to mother's fourth goal to take parenting classes, while she attended the classes and weekly one-hour supervised visitations at the agency, visitation never progressed beyond this minimal amount and mother never sought to increase it.

{¶95} As to mother's fifth goal to have a drug and alcohol assessment, *she refused to obtain such assessment.* She admits she smokes marijuana every day and testified there is no reason she would ever stop. The court noted that mother's "affect and reasoning in court demonstrate poor understanding of the needs of children, children's basic safety requirements, and their need to be free of abusive situations." The court noted it is unclear if this was caused by her marijuana abuse or mental health issues, or both. Mother's refusal to obtain a drug and alcohol assessment, although covered by her welfare medical insurance, further shows she repeatedly failed to remedy the conditions that caused the children to be removed.

{¶96} In view of the foregoing findings of fact, which were supported by clear and convincing evidence, the trial court essentially found that R.C. 2151.414(E)(1) (parent failed to remedy the conditions causing the children's removal) applied to her.

{¶97} **VI. THE TRIAL COURT'S FINDINGS UNDER THE SECOND PRONG OF THE TEST – THE BEST INTERESTS OF THE CHILDREN – R.C. 2151.414(D)(1)**

{¶98} Under the second prong of the permanent custody analysis, the trial court's judgment demonstrates it properly considered all factors required under R.C. 2151.414(D) regarding the best interests of the children. As to the children's relationships, the court noted that, with respect to J.H., his foster parents, the Jaroses, have become his primary source of comfort. He goes to them for affection and support. The court also noted that C.C. and M.H. have adjusted well to their foster parents, Mr. and Mrs. Crawford.

{¶99} The court found C.C. now refuses to visit with mother following a recent incident during visitation, when mother screamed at her and told her that her father had

given her up. The trial court found that among the three children involved in this case, C.C., who was then 12, has endured the most trauma and has the most to deal with due to the abuse inflicted on her by Hanick while C.C. was living with mother. The court found that M.H. and C.C. have adjusted well to their foster home. They have visited J.H.'s foster parents and enjoy being with them.

{¶100} Pertinent to mother's relationship with the children, in 2007, while Me.C., Mi.C., C.C., and J.H. were in mother's care, they were found to be dependent. In April 2014, Me.C. was found to be abused. And, in May 2014, Mi.C., C.C., J.H., and M.H. were found to be dependent. This court has held that such prior adjudications are relevant to a child's relationship with his parent. *A.L.a, supra,* at ¶106.

{¶101} As to the children's wishes, the court noted J.H. has said that he would prefer to live with mother and that he misses the school he attended when he lived with her, but he would be fine staying with the Jaroses. Previously, C.C. wanted to live with her paternal grandfather, but now would prefer being with the Crawfords. M.H. wants to live with the Crawfords.

{¶102} The court noted the children's custodial history. In 2007, C.C. and J.H. were removed from mother and placed in the agency's custody until 2009. Then, in May 2014, C.C., J.H. and M.H. were removed from mother and, since then, have remained in foster care.

{¶103} As to the final best interest factor, the court found that C.C., J.H., and M.H. need a legally secure permanent placement and that such placement cannot be achieved without a grant of permanent custody to the agency. In support, this is mother's second involvement with the agency and, as noted, the children were

27

previously adjudicated dependent in 2007 and 2014 while in her care. As of the trial date, C.C., J.H., and M.H. had been in the agency's temporary custody since May 2014, i.e., one and a half year. Further, mother still does not have stable housing or sustainable income and has not shown a sincere motivation to obtain either. She does not have a legally secure permanent placement for the children and has not demonstrated a likelihood that she will in the foreseeable future.

{¶104} **VII. APPELLANTS' ARGUMENTS**

{¶105} Under J.H.'s first three assigned errors and mother's assignment of error, they argue that the court's award of permanent custody was not supported by sufficient, credible evidence. In support, they reference the following: (1) J.H. said he would prefer to live with mother; (2) the children have a bond with mother; (3) the children's interaction with mother was positive; (4) mother has housing; and (5) mother completed parenting classes. However, when determining whether a child cannot be returned to the parents within a reasonable time, the trial court is entitled to consider "all relevant evidence," not just isolated portions that arguably militate in the parent's favor. R.C. 2151.414(E); *Krems, supra*, at ¶34. And, in weighing the evidence, the court reviews "the entire record," not just isolated portions chosen by the appellant. *Eastley, supra.*

{¶106} As to J.H.'s and mother's argument that J.H. said he would prefer to live with mother, the trial court was entitled to consider that he is just ten years old and that both Ms. Watkins and Ms. Weibling testified it was in the children's best interests that permanent custody be granted to the agency. The court could also consider Ms. Weibling's testimony that J.H. indicated the reason he wants to return to mother is because he wants to live with his siblings and misses his former school.

{¶107} As to J.H.'s and mother's argument regarding the children's bond with mother, the court was entitled to consider Ms. Watkins' testimony that the children are most closely bonded to their foster parents and that the children are "much more relaxed" with their foster parents than with mother. The court could also consider that both C.C. and M.H. have stated they would prefer to stay with the Crawfords even if living with mother was an option.

{¶108} As to J.H.'s and mother's argument regarding the children's interaction with mother, while visits with her were in general positive, the court was entitled to consider that during the 20 months of weekly supervised one-hour visits at the agency, mother's visitation with the children never progressed beyond that point and she never sought to increase visitation with them. The court could also consider that Me.C. refuses to attend all visits with mother and that, due to a recent traumatic visit with mother, C.C. now refuses to visit with her.

{¶109} Further, despite J.H.'s and mother's argument that mother completed parenting classes, the court could consider Ms. Watkins' testimony that this was the only goal mother completed. Mother failed or refused to complete every other goal set by her case plan. In fact, Ms. Watkins testified that mother does not agree with her case plan goals.

{¶110} J.H. and mother argue that because Hanick is now in prison, the threat of abuse has been removed. They cite Ms. Watkins' testimony in support. However, while she conceded the specific threat posed by Hanick has been removed, she said mother poses a threat to the children due to her inability to protect them. For example,

although mother admitted that Earl has assaulted her and the children, she testified she wants the children to move in with her and Earl in the trailer.

{¶111} Next, J.H. and mother argue that because mother's divorce decree awarded the trailer to her, she has housing. However, the court was entitled to consider Ms. Watkins' testimony that mother failed to meet her goal to maintain independent housing. The court was also entitled to consider that under the divorce decree, mother is not entitled to the trailer until it is paid off; mother still does not have title to it; and there is no evidence the trailer was ever paid off. Further, the court was entitled to consider that mother has no money with which to pay her utilities or the $250/month lot rental fee for the trailer. Moreover, the trailer is cluttered and only has two bedrooms, which are inadequate for the children. Also, mother has lost the children's beds due to her failure to pay the storage fee. Further, in 2009, the trial court determined that the trailer was insufficient to accommodate the children. Thus, while the divorce decree grants mother the trailer, ample evidence was presented to support the court's finding that mother failed to complete her goal of maintaining independent housing.

{¶112} Mother argues the agency never offered financial assistance to pay her bills. As to the so-called "reunification funds," Ms. Watkins testified mother never said she needed financial assistance until *after* the time such funds were available (within 15 months after the children were removed). Moreover, during that period, the utilities were on and the bills were current. Also, the agency referred mother to various agencies, including Catholic Charities, which paid at least one of her bills.

{¶113} Next, contrary to mother's argument, the agency never refused to provide transportation to her for her visitation or to attend her mental health counseling

sessions. The evidence showed transportation was never an issue for her. She fails to reference the record in support of this argument. Moreover, the record shows that she drove to visitation and wherever else she wanted to go and that Earl gave her gas money.

{¶114} Mother argues that since the agency returned the children to her and Hanick in 2009, she cannot be criticized for not protecting her children after that time. However, the argument lacks any merit in view of the undisputed facts. Hanick underwent services to address Me.C.'s allegations and was released with no issues noted. But, more importantly, in 2007 and in or before April 2014, Me.C. reported the abuse to mother and *she did not believe her own daughter*. Further, on April 30, 2014, mother was ordered to keep Hanick out of the home and mother failed to comply with that order. And, mother was living in the same house when Hanick repeatedly raped Me.C. and C.C.

{¶115} Upon review of the record, we find substantial evidence which tends to prove every essential element of the agency's motion for permanent custody. Further, as the trier of fact, the trial court was entitled to find, as it obviously did, that the testimony regarding the negative aspects of mother's behavior as they relate to the statutory factors outweighed the positive. In doing so, the trial court did not clearly lose its way and create such a manifest miscarriage of justice that J.H. and mother are entitled to a new trial.

{¶116} We therefore hold that J.H.'s first three assigned errors and mother's assigned error lack merit because the trial court's judgment granting permanent custody to the agency was supported by sufficient, credible evidence.

31

**{¶117}** J.H.'s first, second, and third assignments of error and mother's assigned error are overruled.

**{¶118}** For J.H.'s fourth and last assigned error, he alleges:

**{¶119}** "The trial court erred by not appointing a guardian ad litem for the mother, as testimony showed she suffers from mental and cognitive issues, and she was thus deprived of due process of law; moreover, said failure constitutes plain error and prejudices the rights of both mother and appellant."

**{¶120} VIII. WHETHER TRIAL COURT COMMITTED PLAIN ERROR IN NOT APPOINTING A GUARDIAN AD LITEM FOR MOTHER**

**{¶121}** J.H. argues that, although he did not raise the issue below, the trial court committed plain error in not appointing a guardian ad litem for mother because, if a guardian had been appointed, the court might have reunited him with mother.

**{¶122}** However, J.H. fails to demonstrate the trial court committed plain error. First, there was no error because mother was not entitled to a guardian ad litem. While mother may have "cognitive issues," in the case cited by J.H., *In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, the court held that the appointment of a guardian ad litem requires that the record reveal the ward appeared "mentally incompetent." *Id.* at ¶18. *Accord* R.C. 2151.281(C); Juv.R. 4(B)(3). Mental incompetence means that the person cannot understand and participate in the proceedings. *In re D.C.H*, 9th Dist. Summit No. 22648, 2005-Ohio-4257, ¶9. Nothing in the record indicates the extent to which, if at all, mother's "cognitive issues" impeded her ability to understand and participate in the hearing. In fact, mother's testimony reflects a grasp of the issues and shows that she provided assistance to her attorney in

32

advocating reunification. In similar circumstances, the Ninth District in *D.C.H., supra*, held the trial court did not commit plain error in failing to appoint a guardian ad litem for the mother. *Id.* at ¶15.

{¶123} However, even if mother was entitled to a guardian ad litem, there is no plain error because J.H. fails to demonstrate that he or mother was prejudiced. The following explanation by the Fourth District in *B.E., supra,* is pertinent here:

> {¶124} In the case at bar, even if appellant was entitled to a guardian ad litem, appellant cannot demonstrate that the failure to appoint a guardian ad litem affected the outcome of the proceedings. Appellant's counsel "safeguarded her rights and interests by actively participating in the court proceedings, drawing the court's attention to the positive aspects of appellant's life as they relate to the statutory factors, and arguing against the termination of appellant's parental rights. Appellant has failed to demonstrate how a guardian ad litem would have acted differently or produced a different result." *In re M.T.*, [6th Dist. Lucas No. L-09-1197, 2009-Ohio-6674,] ¶18 * * *. Appellant's counsel zealously represented appellant and advocated that the trial court deny appellee permanent custody. Thus, if a guardian ad litem believed that denying permanent custody was in appellant's best interests, then appellant's counsel fully advocated that position, and appellant did not suffer prejudice.

{¶125} The record shows that neither mother nor J.H. was prejudiced by the lack of a guardian ad litem for mother because her counsel vigorously represented her below just as a guardian ad litem would have done. Mother's counsel highlighted the positive aspects of her life with respect to the statutory factors and advocated that permanent custody not be granted to the agency. We therefore hold that the trial court did not commit plain error in not appointing a guardian ad litem for mother.

{¶126} Appellant's fourth assignment of error is overruled.

{¶127} **IX. CONCLUSION**

33

{¶128} For the reasons stated in this opinion, the assignments of error lack merit and are overruled. It is the order and judgment of this court that the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.

THOMAS R. WRIGHT, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶129} Finding merit in mother's first issue under her assignment of error, and J.H.'s first assignment of error, I would reverse and remand. I do not find the agency carried its burden of proving by clear and convincing evidence that the children could not be placed with mother.

{¶130} Part of mother's case plan included that she obtain work. The purpose of a case plan under R.C. 2151.412 is to reunite parents and children. Therefore, it follows that the case plan must be reasonably related to resolving the issues that led to the removal of the children. The record clearly shows mother suffers from various cognitive disabilities, however the record does not contain any psychological evaluations or other assessments of those disabilities. She testified she suffers from insomnia, manic depression, severe anxiety disorder, and stage two Verbal Asperger's disease, and finds it difficult and painful to be around people.[1] Under the circumstances, finding regular employment would be difficult and it is unclear why the

_____

1. I respectfully disagree with the majority's assertion that mother did not identify the doctor making these diagnoses: she did, testifying it was a psychologist or psychiatrist at PsyCare, a facility she was sent to by the agency.

34

case plan does not include a recommendation for disability assistance. She testified she has applied for Social Security Disability on her own even though the record reveals the agency did nothing to help her obtain it. Obtaining the disability determination should have been part of her case plan, and the agency should have worked with her on this as it would have alleviated the financial burdens standing in the way of reunification. Poverty is no reason to terminate parental rights. The requirement of employment in her case plan, despite her disabilities, appears from the record to be unrealistic and discriminatory.

{¶131} Mother's case plan required her to obtain stable housing. Despite her disabilities she accomplished this goal. She had the rental house in McDonald until three months before the initial hearing date below. Due to her lack of income (which could have been rectified if the agency helped her to obtain disability assistance), she had to move into the trailer in Vienna, occupied by her former husband Earl Carroll – but which she owned as a result of their divorce. Ms. Watkins testified the rental house in McDonald had been very cluttered and dirty, but admitted the trailer was cleaner and better kept. Mother was current on her utilities.

{¶132} Mother's case plan required her to undergo counseling, which she initiated, before being released from the program for missing appointments. However, the failure to include in her case plan any objectives and goals for her counseling including assessments and evaluations for trauma, domestic violence and overall cognitive abilities as well as specific reports and notes regarding the sessions she did attend, make it impossible for this court and presumably the trial court to properly

35

assess what problems were identified, and why the failure to continue counseling was relevant to her ability to properly care for her children.

{¶133} The requirement in Mother's case plan that required she undergo a drug and alcohol assessment, although helpful, is not evidence-based and does not appear to be relevant in any way to removal of the children. Mother did not complete the drug and alcohol assessment. She admitted to being a daily user of marijuana. However, use of marijuana or alcohol does not, in and of itself, mean a parent is unfit. Nothing in the record indicates she used marijuana in the presence of the children, or that it interfered with her parenting. Ms. Watkins testified that mother never appeared impaired at her weekly visitation with the children, or when Ms. Watkins visited mother's house.

{¶134} There are positive aspects to mother's conduct which need to be emphasized. Her case plan required her to complete parenting classes, which she did, and Ms. Watkins testified she thereafter displayed skills learned.

{¶135} Mother is bonded with her children, and all except M.H., who is not subject of this case, appeared bonded with her. She only missed visitation twice, due to her car breaking down, and the visitations were successful. Mother would bring the children food, hand out plates, and feed them. She would discuss school with them, and play music CDs. She enjoyed cutting her sons' hair. The literature supports the extensive trauma experienced by children when they are removed from their primary caregiver.

{¶136} The record reveals that mother was able to provide for the children's daily needs and activities. The children are all bright, and get good grades. Ms. Watkins

admitted the agency had never received any referral regarding the children due to lack of nourishment or proper clothing.

{¶137} The failures in mother's conduct recounted by the majority, and encapsulated above, when there is no evidence that would indicate or provide reliable data of the case plan requirements for the trial court or this court when deciding the issues at hand, would not constitute a basis for depriving her of parental rights.  Rather, the point referred to by the agency witnesses, the guardian ad litem, and the magistrate was that mother is unable to provide for the safety of her children, due to her failure to identify and acknowledge Michael Hanick's rape of M.C. and C.C.   But Mr. Hanick is in prison for at least ten years; his parental rights have been terminated.  Mr. Hanick was the offending adult, not the mother in this case, yet the court relied on penalizing her for his sexual abuse, despite her cognitive difficulties.  The record is clear that mother was not complicit in the abuse.  The majority's opinion, as well as the lower court, assumes for its conclusions that somehow the entire family, including the children, would not recognize, and/or do the right thing once confronted with the situation again and as such were prospectively unsafe.  This is unsupported by any evidence-based protocols in the record.  The failure of mother to acknowledge and recognize the abuse, after the fact, could be related to her own trauma.  However, there is no evidence that she knew anything about the abuse while it was happening.  Furthermore, she as well as the agency, assumed in 2007 that Mr. Hanick's issues had been remedied.  In fact, by the time of the hearings in this matter, mother had cut off all contact with him.  There is no expert testimony, or evidence-based submissions, as to why the factor relied upon in the trial court is determinative of the outcome in this case considering she has cut off all

contact with Mr. Hanick.  The affect of unknowingly and unwittingly having your children victimized, then breaking off the relationship and working with the agency should be sufficient to support mother's reunification with her children as we have no scientific or otherwise expert data in the record that mother's failure to believe her children, retrospectively would result in mother involving herself with another sex offender in the future.

{¶138} M.C. first revealed Mr. Hanick had been molesting her in 2007.  She entered the custody of the agency, with the other children remaining with mother and Mr. Hanick.  M.C. told a caseworker she informed mother of the molestation; mother denied this.  While the agency believed M.C., it could not find any evidence of molestation, and Mr. Hanick cooperated successfully in receiving treatment.  Eventually, M.C. was returned home to mother and Mr. Hanick.

{¶139} In April 2014, M.C. told her school counselor that Mr. Hanick was molesting her again.  Custody of M.C. was granted to the agency.  Late in May, C.C. told M.C. during visitation that Mr. Hanick was now molesting her.  All of the children were removed from the home; Mr. Hanick was arrested, and eventually pleaded guilty to raping the two girls.  He is serving ten years to life imprisonment.

{¶140} The fact that mother does not accept that Mr. Hanick raped her daughters is deeply troubling.  However, it should be noted the evidence is that C.C. never said anything to her, and that Mr. Hanick successfully completed his program following the initial incident with M.C. in 2007.  Mother did testify that she never saw any indication Mr. Hanick was molesting the girls.

{¶141} The legal standard for decision here is provided by R.C. 2151.414(E), which provides, in pertinent part:

{¶142} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶143} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, *the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home*." (Emphasis added.)

{¶144} Mr. Hanick is the reason these children were placed outside the home. Again, he is imprisoned; his parental rights have been terminated. While it was the state, rather than mother, which remedied the condition, it was remedied. Mother testified she has ceased all contact with Mr. Hanick; does not receive correspondence from him anymore; and has not visited him in prison. Under these circumstances, I cannot find the agency proved its case the children could not be placed with mother by the high standard of clear and convincing evidence.

**{¶145}** However, the record discloses information about mother's relations with several other men, during which time she did not have custody of her children, which was used in the trial court, and by the majority, in bolstering the conclusion mother cannot provide for the safety of the children. She moved back into the trailer with her former husband, Earl Carroll, who previously committed domestic violence against her and the children, and who sexually harassed her when she returned. However, by the second hearing date, she had obtained Mr. Carroll's eviction. Thus, he does not enter the equation.

**{¶146}** By the time of the second hearing date, mother's friend, Kaleigh Lemon, and her boyfriend D.J., had moved into the trailer with mother. They were paying the bills. Mother admitted she did not recall D.J.'s last name, and had not enquired about his criminal history, if any. However, she also testified that Kaleigh and D.J. would move out of the trailer, and go to Tennessee, if and when the children were returned to her.

**{¶147}** Mother briefly dated a man named Nick during the course of the proceedings below, but testified he was out of her life. She also has an ongoing internet relationship with a man named Robert, from Texas. She testified she would like to move to Texas with the children to be with him. Robert has never been interviewed by the agency – but, presumably, the agency would add him to the case plan if the relationship goes forward. Penalizing the mother for her association with men, while her children were not in her care, is again a fact that does not support removal or reunification of the children, without expert testimony signaling same.

**{¶148}** This is a very difficult case. The trial court's magistrate, and all counsel involved, did exemplary work. However, I believe we must use more scientifically accepted, peer-reviewed, evidence-based assessment tools in cases such as this, to support the record when dealing with permanent custody. They are available in various fields relating to family law. *See, e.g.*, Daniel G. Saunders, Ph.D. (2015) Research Based Recommendations for Child Custody Evaluation Practices and Policies in Cases of Intimate Partner Violence, Journal of Child Custody, 12:1, 71-92, DOI: 10.1080/15379418.2015.1037052. Use of evidence in the case plan can be tailored, and the data used to treat and assess strengths and weaknesses of the family and to facilitate a better record for the trial court to make factual determinations which will be more scientifically reliable and improve outcome.

**{¶149}** The majority notes that the termination of parental rights is the family law equivalent of the death penalty, and the agency must carry its burden by clear and convincing evidence. The agency, as well as the court, needs to employ an evidence-based approach in using more than conjecture and lay opinion testimony in order to sustain their burden under a clear and convincing evidence standard in this matter. The record does not support the finding of the trial court.

**{¶150}** Finding that it did not, I respectfully dissent.